835 So.2d 1150 (2002)
Julian DiMASE and Gaetano DiMase, Appellants,
v.
AQUAMAR 176, INC., and Chicago Title Insurance Company, Appellees.
No. 3D01-915.
District Court of Appeal of Florida, Third District.
May 29, 2002.
Armstrong & Mejer, P.A., and Alvaro L. Mejer, for appellants.
Frankel & Lieberman, P.A., and Robert P. Frankel, for appellees.
Before JORGENSON, GREEN, and RAMIREZ, JJ.
PER CURIAM.
Prospective buyers appeal from an order of final summary judgment in an action brought against the sellers to recover deposits for the purchase of two condominium units. We affirm.
*1151 Julian and Gaetano DiMase signed purchase agreements for two condominium units which were under construction. The units were both located at the same complex. The agreements specified that floor coverings were not included with the sale of the units. The buyers also signed proposed addenda which specified that the seller would install at its own cost marble flooring throughout the units, "marble design and color to be specified by buyer." The addenda were not signed by the seller/developer. Each buyer tendered ten percent deposits. Chicago Title is the deposit escrow holder.
After signing the documents and tendering the deposits on May 1, 1998, the buyers returned to their homes in Venezuela. Although the seller approved the purchase price, it rejected the addenda and substituted the following: "Seller to provide marble floors of the same quality and value as shown in sales model unit # 1208." When the seller's proposed addenda were telefaxed to Venezuela, the buyers did not sign them. Instead, by letter dated July 17, the buyers rejected the seller's proposed addenda and declined to pay the next deposits due. When the seller refused to return the deposits, the buyers sued to recover the funds held in escrow. The seller filed an answer, affirmative defense and counterclaim for a declaratory judgment to have the buyers declared in default. Following entry of summary judgment for the seller, the buyers appeal.
We find no merit in the buyers' argument that the Purchase Agreements were actually offers, and that when the parties could not agree on the flooring, the buyers each rejected those offers. "In construing contracts, the intention of the parties governs, and such intention will be determined from the language used when it is unambiguous." Robbinson v. Central Properties, Inc., 468 So.2d 986, 988 (Fla. 1985).
The terms of the Purchase Agreement clearly and unambiguously express the parties' intent to be bound by its terms. Each Purchase Agreement states that "buyer agrees to buy and seller agrees to sell ..." and that "this Agreement is the entire contract for sale and purchase of the units and once it is signed, it can only be amended by a written instrument signed by the party against whom enforcement is sought which specifically states that this is amending this Agreement." (emphasis added). It is undisputed that both parties signed the Purchase Agreement. Further evidencing the parties' intent to enter into a binding contract upon execution is the severability clause of the agreement. The severability clause provides, in pertinent part, that any parts which are unenforceable will be modified or nullified "in order that the mutual paramount goal (that this Agreement is to be enforced to the maximum extent possible strictly in accordance with its terms) can be achieved." In addition, the Purchase Agreement provides a specific period, fifteen days after its execution, during which the buyers could have avoided the Purchase Agreement by providing the seller with written notice. These are the terms to which the buyers agreed, as evidenced by their signatures on the Purchase Agreements. See Acceleration Nat'l Serv. Corp. v. Brickell Fin. Servs. Motor Club, Inc., 541 So.2d 738, 739 (Fla. 3d DCA 1989) (holding that the best evidence of the parties' intent is the document sought to be enforced); Robbinson, 468 So.2d at 988. The Purchase Agreement was objectively a final expression of the buyers' intent to buy, and the seller's intent to sell, the condominium unit. See Gendzier v. Bielecki, 97 So.2d 604, 608 (Fla.1957). In Robbie v. City of Miami, 469 So.2d 1384, 1385 (Fla.1985), the Florida Supreme Court wrote:
"We have consistently held that an objective test is used to determine whether a contract is enforceable.... `The making *1152 of a contract depends not on the agreement of two minds in one intention, but on the agreement of two sets of external signsnot on the parties having meant the same thing but on their having said the same thing.' ... In addition, parties to a contract do not have to deal with every contingency in order to have an enforceable contract."
(quoting Blackhawk Heating & Plumbing Co. v. Data Lease Fin. Corp., 302 So.2d 404, 407 (Fla.1974) and Gendzier v. Bielecki, 97 So.2d 604, 608 (Fla.1957)). Accordingly, we hold that the Purchase Agreement was a valid contract for the sale and purchase of a condominium.
Likewise, we reject the buyers' argument that no contract was formed because there was no meeting of the minds. A "meeting of the minds" defense succeeds only where the parties have failed to agree on an essential term of the contract:
While a `meeting of the minds' may not be necessary as to every term for a contract to be formed, mutual assent is certainly necessary as to an essential term such as the financing terms of this real estate transaction.... Because an essential term of the contract which cannot be supplied by implication was not assented to, no contract was formed and none of its provisions became binding.
David v. Richman, 568 So.2d 922, 924 (Fla. 1990) (citations omitted); see also Bowen v. Larry Gross Const., Inc., 781 So.2d 464, 466 (Fla. 5th DCA 2001) ("Even though the details are not definitely fixed, an agreement may be binding if the parties agree on the essential terms and seriously understand and intend the agreement to be binding on them. A subsequent difference as to the construction of the contract does not affect the validity of the contract or indicate the minds of the parties did not meet with respect thereto."); see also Robbie v. City of Miami, 469 So.2d 1384, 1385 (Fla.1985).
The buyers have not even attempted to explain how marble flooring was an "essential term," without which the contract could never be formed. See, e.g., Fox v. Sails at Laguna Club Dev. Corp., 403 So.2d 456 (Fla. 3d DCA 1981). The definition of "essential term" will "vary widely according to the nature and complexity of each transaction and will be evaluated on a case-by-case basis."Socarras v. Claughton Hotels, Inc., 374 So.2d 1057, 1060 (Fla. 3d DCA 1979); see also Giovo v. McDonald, 791 So.2d 38, 40 (Fla. 2d DCA 2001) ("Certainly, what is an `essential term' of a contract differs according to the circumstances."). Even if marble flooring could be deemed an essential term, it was, in fact, referenced in the Purchase Agreement, as flooring was specifically excluded. See Giovo, 791 So.2d at 39 (holding that essential terms include those specified in the "offer ... [and] an acceptance is effective to create a contract only if it is absolute and unconditional, and identical with the terms of the offer"). The buyers accepted the terms of the offer, which were memorialized in the clear and unambiguous Purchase Agreement. The sellers never changed, altered, modified, or deviated from the terms of the offer, which specifically provided that flooring is not included absent some form of addendum signed by both parties. See Press v. Jordan, 670 So.2d 1016 (Fla. 3d DCA 1996) (holding that no meeting of the minds, and hence no contract, was formed when condominium sellers unilaterally modified contract by altering interest rate term and purchasers did not consent to modification). The parties' failure to agree on the flooring addenda does not affect the enforceability of the Purchase Agreement. See Mercedes Homes, Inc. v. Osborne, 687 So.2d 840 (Fla. 2d DCA 1996) (holding that all the terms of an original contract that are not modified, substituted, or amended remain in full force and effect).
*1153 Because the buyers failed to void the contract within the 15 day contractual period,[1] and the Purchase Agreement provides for liquidated damages in the amount of the deposit, the buyers are not entitled to recovery of the deposits. Accordingly, the judgment is
AFFIRMED.
JORGENSON and GREEN, JJ., concur.
RAMIREZ, J., (dissenting).
I respectfully dissent. The majority opinion will unnecessarily disturb longstanding principles in contract law, and will create uncertainty and confusion in the drafting and execution of real estate agreements.
It is important to bear in mind that this appeal comes to us from an order granting summary judgment. Viewing the evidence in the light most favorable to the appellants, Julian and Gaetano DiMase, the inescapable conclusion is that summary judgment was improvidently granted. Even if we only view the undisputed facts, summary judgment should be reversed.

I. The Undisputed Facts

On May 1, 1998, the DiMases each signed four separate documents, all prepared by the seller, Aquamar 176, Inc., through its sales executive, Rafael Rodriguez. These documents consisted of (1) a "Purchase Agreement," (2) an "Amendment to Purchase Agreement," (3) an "Addendum," and (4) a Receipt for Condominium Documents. The four documents were executed only by the purchasers, the DiMases, who departed for Venezuela after signing.
The sixteen-page Purchase Agreements specified the purchase price for each unit as $634,000 and $628,000, respectively. Paragraph 15, entitled "Certain Items and Materials," provided, in pertinent part, as follows:
Buyer understands and agrees that certain items such as the following ... are not included with the sale of the Unit:... carpets or other floor coverings ... Items such as these will not be included in the Unit unless specifically provided for in a Rider or Schedule to this Agreement signed by both Buyer and Seller.
Additionally, Paragraph 38 contained an integration clause.
The second document signed by the buyers was the Addendum, which provided in pertinent part as follows:
1. This Addendum shall be deemed a part of, but shall take precedence over and supersede any provisions to the contrary contained in, the Agreement.
2. Seller shall install, at his cost, marble flooring in the kitchen, living room, dining room, washer and dryer room, balconies, baseboards and bathroom walls. Marble, design and color to be specified by buyer.
The third document was the Amendment to Purchase Agreement, under which the DiMases offered to pay an additional $50,000 for one unit and an additional $30,000 for the other unit for the exclusive use of two pool cabanas.
Finally, the Receipt for Condominium Documents provided that the Purchase *1154 Agreement was "voidable by the buyer by delivering written notice of the buyer's intention to cancel within 15 days after the date of execution of the purchase agreement by the buyer ..."
After the DiMases left, Jennifer Cruickshank, Aquamar's closing coordinator, reviewed the package of DiMase documents. Cruickshank was concerned that the addenda were too open-ended and that specification of the marble requested by the DiMases would be necessary. On May 5, she telephoned Aquamar's president, who was traveling in Russia. Although he approved the sale prices, Aquamar's president considered the addenda "ridiculous" and "insulting". He sent Cruickshank a memorandum, directing:
Before these contracts are signed I need to know what is being credited by the broker. Must include all costs of marble and $10,000 reduced from price of Pool Cabana. Addendum must be adjusted not to include marble on the walls of the bathrooms.
At this point, Aquamar prepared new addenda whereby the seller would provide marble floors of the same quality and value as shown in the sales model. The DiMases never executed the new addenda. On July 17, 1998, they wrote to Aquamar, "rescinding their offer to purchase." Rodriguez attempted to revive the deal by writing to Julian DiMase and asking him what type of flooring he wished, but no agreement was reached.

II. The offer

It is clear from the conduct of the parties that on May 1, 1998, the DiMases made an offer to purchase two condominiums. Although the offer was made in the form of separate documents, all must be viewed together. Southfork Investments Group, Inc. v. Williams, 706 So.2d 75, 80 (Fla. 2d DCA 1998) ("documents executed as part of a single transaction and concerning the same subject matter must be construed together."). In OBS Co., Inc. v. Pace Constr. Corp., 558 So.2d 404, 406 (Fla.1990), the supreme court was confronted with a similar situation in which multiple documents were involved in the litigation. The supreme court stated that "[i]t is a generally accepted rule of contract law that, where a writing expressly refers to and sufficiently describes another document, that other document, or so much of it as is referred to, is to be interpreted as part of the writing." Id. at 406 (citing J.M. Montgomery Roofing Co. v. Fred Howland, Inc., 98 So.2d 484 (Fla. 1957)); United States Rubber Prods. v. Clark, 145 Fla. 631, 200 So. 385, 388 (1941) (stating that "where a writing expressly refers to and sufficiently describes another document, that other document, or so much of it as is referred to, is to be interpreted as part of the writing."); McGhee Interests, Inc. v. Alexander Nat'l Bank, 102 Fla. 140, 135 So. 545 (1931). The fact that this line of cases dates back over seventy years demonstrates that this principle of law is very well established.
Aquamar could no more select which documents to sign than it could change the purchase price of the DiMases' offers. See Corbin on Contracts § 2.10, at 170-71 (Joseph M. Perillo ed., rev. ed. 1993)("In the process of making a contract, either orally or in writing, the parties may express their assent piecemeal, agreeing upon individual terms as the negotiation proceeds. These expressions are merely tentative and are inoperative in themselves; there is no contract until the parties close their negotiation and express assent to all the terms of the transaction together.") (emphasis added).[2]
*1155 Furthermore, the rule in contract law is that any ambiguity should be construed against the party that drafted the contract. See King v. Guaranty Nat'l Ins. Co., 440 So.2d 607, 608 n. 1 (Fla. 3d DCA 1983). It is undisputed that all the documents were drafted by Aquamar.
At the point that the buyers each signed four documents and left for Venezuela, the documents can only be viewed as an offer to purchase. The majority rejects the argument that these documents constituted an offer to purchase, but does not explain, in terms of contract law, what the documents represent. The documents certainly did not constitute contracts because the seller's signature was absent. As is well established, basic contract formation requires offer, acceptance and consideration. The inescapable conclusion is that the buyers signed an offer. The fact that the documents contained language which clearly and unambiguously expressed the parties' intent, as the majority's opinion suggests, does not change the nature of the offer into a contract until the seller accepts the offer, which occurred days later. If Aquamar had not executed the "Purchase Agreement" at all, there would have been no contract. Likewise, if Aquamar had changed the purchase price or any other essential term, the majority would agree that Aquamar was making a counteroffer and there would have been no contract until the DiMases accepted the counteroffer by initialing the change.
"[A]n acceptance is effective to create a contract only if it is absolute and unconditional, and identical with the terms of the offer." Giovo v. McDonald, 791 So.2d 38, 40 (Fla. 2d DCA 2001). Otherwise stated, "[a]n acceptance must contain an assent to the same matters contained in the offer." Id. While the majority cites Robbie v. City of Miami, 469 So.2d 1384, 1385 (Fla.1985), for the proposition that the parties to a contract do not have to deal with every contingency in order to have an enforceable contract, it is axiomatic that the type and quality of flooring would be a foreseeable contingency in any newly-built condominium. In this case, the contingency was a deal-killer.

III. No "Meeting of the Minds"

"It is well-established that a meeting of the minds of the parties on all essential elements is a prerequisite to the existence of an enforceable contract." Greater New York Corp. v. Cenvill Miami Beach Corp., 620 So.2d 1068, 1070 (Fla. 3d DCA 1993). "To result in a contract, an acceptance of an offer must be absolute and unconditional, identical with the terms of the offer and in the mode, at the place and within the time expressly or impliedly required by the offer." Ribich v. Evergreen Sales & Service, Inc., 784 So.2d 1201, 1202 (Fla. 2d DCA 2001) (citing Sullivan v. Economic Research Props., 455 So.2d 630, 631 (Fla. 5th DCA 1984)) (emphasis added).[3] A *1156 counteroffer operates as a rejection of a preceding offer. See Padron v. Plantada, 632 So.2d 113 (Fla. 3d DCA 1994). See also Cheverie v. Geisser, 783 So.2d 1115, 1119 (Fla. 4th DCA 2001) ("Generally, the acceptance of an offer which results in a contract must be absolute and unconditional, identical with the terms of the offer, and in the mode, at the place, and within the time expressly or impliedly stated within the offer. Thus, `[an] acceptance must contain an assent to the same matters contained in the offer.'" (citation omitted)).
In Socarras v. Claughton Hotels, Inc., 374 So.2d 1057 (Fla. 3d DCA 1979), we stated that to be an enforceable real estate contract, the statute of frauds requires that the contract be embodied in a written memorandum signed by the party against whom enforcement is sought and that the written memorandum disclose all of the essential terms of the sale, and these terms may not be explained by resort to parol evidence. Id. at 1059. We then refused to enforce an unsigned RAMCO form, stating that "in order for an unsigned writing to be used to supply the essential elements of an enforceable contract, there must be some reference to that unsigned writing in the signed writing." Id. But in our case, the DiMases are not seeking to enforce the unsigned Addendum. They are simply attempting to show that there was no meeting of the minds and, therefore, no enforceable contract by either party. See also Drost v. Hill, 639 So.2d 105, 106 (Fla. 3d DCA 1994) (Where it appears that the parties are continuing to negotiate as to essential terms of an agreement, there can be no meeting of the minds.).
Almost a century ago, the Florida Supreme Court explained this principle as mutuality of assent in Strong & Trowbridge Co. v. H. Baars & Co., 60 Fla. 253, 54 So. 92 (1910):
In order to create a contract, it is essential that there should be a reciprocal assent to a certain and definite proposition. So long as any essential matters are left open for further consideration, the contract is not complete, and the minds of the parties must assent to the same thing in the same sense. 1 Story on Contracts, § 490; Etheredge v. Barkley, 25 Fla. 814, 6 South. 861 [ (1889) ].
In the making of a valid contract, the parties must not only be capable of an intelligent assent, but they must actually give their assent; and the assent must be precisely the same thing, and at the same instant of time. Consequently, if one assents to a certain thing and the other assents to it only with modifications, or if one assents to it at one time and the other at a different time, no agreement or contract arises therefrom. From this it is clear that an offer must be accepted before it can become a binding promise. While the assent of both parties must be at the same instant of time, it is not necessary that the communication shall be simultaneous.
The acceptance of an offer, to result in a contract, must be: (1) Absolute and unconditional; (2) identical with the terms of the offer; and (3) in the mode, at the place, and within the time expressly or impliedly required by the offer. If a person offers to do a definite thing, and the person to whom the offer is made accepts conditionally, or introduces a new term into the acceptance, his answer is not an acceptance; but it is either a mere expression of willingness to that, or it is in effect a counter offer, *1157 which must be accepted or assented to before a contract can result.
Id. at 93-94 (emphasis added). See also State v. Family Bank of Hallandale, 623 So.2d 474, 479 (Fla.1993) (mutual assent is an absolute condition precedent to contractual formation); David v. Richman, 528 So.2d 25, 27 (Fla. 3d DCA 1988).
The majority rejects the DiMases' "meeting of the minds" argument because they have not explained how marble flooring was an "essential term." It strains logic that the DiMases would be willing to pay $1,262,000 for two luxury condominiums, only to live on cement floors. As the majority recognizes, what is an "essential term" must be evaluated on a case-by-case basis. See Opinion, p. 1152. It differs according to the circumstances. Id. Again, we must remember that the case is before us because the trial court entered summary judgment. It strains logic to determine that, as a matter of law, the flooring was not an essential term. Perhaps the majority feels that the buyers are using the marble floor argument as an excuse to rescind the contract. With all due respect, that may be a good argument to present to the jury, but not on summary judgment.
On the contrary, it seems clear from the conduct of the parties that the type and quality of the flooring was an important term in the negotiations. Aquamar's representatives gave the DiMases the standard sixteen-page "Purchase Agreement" in February, 1998, when they originally expressed an interest in purchasing the units. They reviewed the form with their attorney. The DiMases, however, were not interested in purchasing these luxury apartments with no flooring. They wanted marble floors and expressed their desire objectively by having the salesperson prepare the Addenda.
Aquamar also behaved as if this was an essential term in the negotiations. Aquamar's closing coordinator was immediately concerned about the marble flooring and the president reacted strongly to the flooring specifications. The majority does not discuss the cost of marble flooring, but it evidently was sufficient to cause the closing coordinator to telephone the president of Aquamar in Russia to discuss it.
The majority then posits that, even if marble flooring was an essential term of the contract, the term was specifically excluded from the Purchase Agreement. It seems to me, however, that this is the equivalent of someone standing in the shade and concluding it is a cloudy day. We cannot simply look only at the Purchase Agreement. If the clause regarding the marble floors had been included within the "Purchase Agreement," Aquamar could not have stricken the clause and argued that there was an enforceable contract. It was for the convenience of Aquamar, who was the author of all these documents, that this important term in the DiMases' offer was contained in a separate document. It was clearly envisioned within the "Purchase Agreement" itself that any flooring would be specified in a separate document.[4]
The majority states that the "buyers accepted the terms of the offer ..." Opinion at p. 1152. What offer? It was the buyers who made the offer. The majority then states that the "sellers never changed, altered, modified, or deviated from the terms of the offer (sic) ..." citing Press v. Jordan, 670 So.2d 1016 (Fla. 3d DCA 1996). That case, however, fully supports the DiMases' position. In Press v. Jordan, the "sellers made several changes to the contract including changing *1158 the financing section ... The buyers did not consent to this change ..." Id. at 1017. We affirmed summary judgment in favor of the buyers'[5]
To affirm, the majority insists on looking only at the language of the Purchase Agreement which specifically excludes marble flooring. Even the seller, however, was willing to look beyond the Purchase Agreement when it was advantageous to do so. Aquamar had no problem looking at and agreeing to the Amendments which increased the purchase price by $50,000 and $30,000, respectively. By its own conduct, Aquamar has conceded that other documents, besides the Purchase Agreement, were part of the DiMases' offers. Furthermore, if we look only at the "Purchase Agreement," Aquamar's sixteen-page contract contemplated that a "Rider or Schedule" would be used to modify the "Purchase Agreement" as pertained to the non-inclusion of floor coverings. The fact that Aquamar's sales representative chose to label them as addenda, instead of as riders or schedules, should be of no consequence.
In fact, the majority opinion concludes with a footnote referencing a document separate from the Purchase Agreement, the "Receipt for Condominium Documents," executed by the DiMases, which gave them 15 days to cancel the Purchase Agreement. The majority states that the DiMases could have voided the contract within the first 15 days, but does not explain why the seller would be bound by the contents of this document, which it never signed, any more than by the Addenda that specified the type of flooring.

IV. Conclusion

I would therefore recognize that the four documents as a whole constituted the offers to purchase the two units and that when Aquamar submitted new addenda, they were making a counteroffer, which was never accepted. Accordingly, there was no meeting of the minds and no contract.
For these reasons, I would reverse.
NOTES
[1] The following language was included in the "Receipt for Condominium Documents," which the buyers executed:

THE PURCHASE AGREEMENT IS VOIDABLE BY BUYER BY DELIVERING WRITTEN NOTICE OF THE BUYER'S INTENTION TO CANCEL WITHIN 15 DAYS AFTER THE DATE OF EXECUTION OF THE PURCHASE AGREEMENT BY THE BUYER AND RECEIPT BY THE BUYER OF ALL OF THE DOCUMENTS TO BE DELIVERED TO HIM BY THE DEVELOPER.
The Purchase Agreement contained the same language.
[2] This section also states:

A document is a "written contract" if it has been assented to by the necessary parties as expressing fully and accurately the terms upon which they have agreed. Such a document was described by Wigmore as an "integration" of the agreement. The question whether they have so agreed is a question of fact, one that the document itself cannot answer; extrinsic evidence of their assent to it as such is always necessary, even though the document bears the signatures of the parties. The existence of such a signed document may indeed be evidential of assent to it as an "integration," its weight as such evidence depending upon the character and terms of the writing that it contains and upon its physical appearance. But it is never conclusive. The "parol evidence rule," cited in thousands of opinions, has been stated in various forms, with many "exceptions."... [I]t excludes no evidence and has no legal operation until the fact of assent to the document as an accurate "integration," has been established.
Id. at 175.
[3] See also Williston on Contracts § 6:11, at 85-88 (Richard A. Lord ed., 4th ed.1990) (stating that "because the offeror is entitled to receive what it is he has bargained for, if any provision is added to which the offeror did not assent, the consequence is not merely that the addition is not binding and that no contract is formed, but that the offer is rejected, and that the offeree's power of acceptance thereafter is terminated.").
[4] See Paragraph 15 of the "Purchase Agreement," stating that "[i]tems such as [floor coverings] will not be included in the Unit unless specifically provided for in a Rider or Schedule to this Agreement signed by both Buyer and Seller."
[5] The majority also cites Mercedes Homes, Inc. v. Osborne, 687 So.2d 840 (Fla. 2d DCA 1996), but that case involved the interpretation of two different contracts which both sides agreed were enforceable, hardly our situation.