302 So.2d 404 (1974)
BLACKHAWK HEATING & PLUMBING CO., INC., an Illinois Corporation, and Andrew Machata, Petitioners,
v.
DATA LEASE FINANCIAL CORP., a Florida corporation, Respondent.
No. 45003.
Supreme Court of Florida.
October 24, 1974.
Rehearing Denied November 22, 1974.
*405 Jos. D. Farish, Jr. and F. Kendall Slinkman, of Farish & Farish, West Palm Beach, for petitioners.
Marshall M. Criser and Robert T. Scott, of Gunster, Yoakley, Criser, Stewart & Hersey, Palm Beach, for respondent.
ADKINS, Chief Justice.
By petition for certiorari, we have for review a decision of the District Court of Appeal, Fourth District (Blackhawk Heating & Plumbing Co. v. Data Lease Financial Corp., 287 So.2d 118 (Fla.App. 4th, 1973), which allegedly conflicts with prior decisions of this Court and the District Courts of Appeal on the same point of law. Fla. Const., art. V, § 3(b)(3), F.S.A.
For clarity, the petitioners, plaintiffs in the trial court, are referred to as "Blackhawk and Machata"; the respondent, defendant below, is referred to as "Data Lease."
In September, 1969, Data Lease entered into an agreement with the "Cohen group" to purchase 870,000 shares of the common stock of Miami National Bank for a purchase price of $10,440,000. Under the terms of the purchase, Data Lease was obligated to pay $2,160,000 by July 1, 1970, but found it impossible to meet this immediate cash obligation.
Talmo, President of Data Lease, sought the assistance of Machata in borrowing $2,000,000. Machata proposed that he purchase 25 per cent of Data Lease's 870,000 shares of stock, but, at Talmo's request, this proposal was abandoned for tax reasons. Talmo proposed that Data Lease pay $1,500,000 to the Cohen group and secure the release of 200,000 shares in the bank which Data Lease agreed to pledge against the new $2,000,000 note. The remaining $500,000 of the $2,000,000 loan (except $40,000 in loan expense advanced by Machata) would be used by Data Lease as it saw fit in its own corporate activity. The Central States, Southeast and Southwest Areas' Pension Fund agreed to the proposal, in view of the credit rating of Blackhawk and Machata.
The initial proposition that Machata would immediately purchase 25 per cent of Data Lease's position in the bank was discarded at Talmo's suggestion that Machata's *406 initial participation be in the form of an option to purchase, because so long as Data Lease maintained an 80 per cent ownership of the bank stock, Data Lease would qualify to file a consolidated tax return with the bank. 26 U.S.C. § 1501 et seq.
Data Lease had accumulated operating losses of $3,760,000 over a period of three years prior to the proposed stock purchase. Control of the bank would permit Data Lease, by separate agreement with the bank, to obtain payments from the bank of approximately 95 per cent of the money that the bank would otherwise have paid to the Internal Revenue Service but for the aspect of consolidated tax reporting. These payments are referred to as "upstream" tax payments. The parties could foresee immediate financial benefit to Data Lease by use of the upstream tax payments.
On May 18, 1970, Machata, Talmo and others went to Chicago and executed the option agreement which gave rise to this litigation. On the same day as the execution of the option agreement, a $2,000,000 loan was made by the Pension Fund. Under the terms of this loan, Blackhawk, Machata and Data Lease were co-obligors to the Pension Fund in the amount of $2,000,000. The promissory note was secured by a pledge agreement of the 200,000 shares of bank stock released by the Cohen group. Machata guaranteed the loan personally.
$1,500,000 of the $2,000,000 loan was paid directly to the Cohen group as partial payment for release of 200,000 shares of bank stock which was to go to Blackhawk upon exercise of the option. $40,000 of the loan was paid to Machata as reimbursement for money advanced by him personally, relative to initial loan costs. The balance, $460,000, went directly to Data Lease to be used as it saw fit.
Under the option agreement Blackhawk could purchase 217,500 shares (or 25 per cent of the 870,000 shares) from Data Lease. The purchase price was to be computed upon a rather complex mathematical formula set forth in the agreement.
The portion of the option agreement primarily involved in this litigation reads as follows:
6(b) "Any cash flow benefit, including any tax benefits, derived by Data as a consequence of its holding, hypothecation, assignment, pledge, etc., of MNB Stock shall inure proportionately to Blackhawk in calculation of any payments due between the parties."
Blackhawk, by lending its credit to Data Lease, not only rescued Data Lease from financial problems with reference to its purchase of the bank stock, but actually placed Data Lease in a position where, as an 80 per cent stockholder in the bank, Data Lease could derive substantial income as a result of the stock ownership. So long as Data Lease continued to retain an 80 per cent interest in the bank, it could avail itself of the advantage of consolidating its tax returns with the bank. Data Lease did so avail itself and obtained substantial benefit as a result thereof.
On January 25, 1971, within the option period, Blackhawk notified Data Lease in writing that it was exercising its option to purchase the shares of stock, taking the position that sufficient "cash-flow benefits" had been derived so that the option could be exercised. Blackhawk's position was that the "cash-flow benefits" received by Data Lease more than offset the cash items due Data Lease on exercise of the option. Blackhawk requested a review of the books of the bank and Data Lease so that a final closing statement could be prepared and the correct calculation made. Data Lease refused to honor the option agreement and Blackhawk brought this suit for specific performance. Data Lease defended on the ground that the term "cashflow benefit" was vague and indefinite, so that the agreement was void and unenforceable. Also, Data Lease contended the option was not properly exercised.
*407 A Special Master was appointed and his report demonstrates that the income of Data Lease and its subsidiary corporations increased after the $2,000,000 loan. For example, for the period from July 1, 1970, through June 30, 1971, the direct or indirect increase in net income to Data Lease as a result of its performance of management services was $185,790, and for the period July 1, 1971, through June 30, 1972, the direct or indirect increase in net income to Data Lease for such services was $104,559. The amount of "upstream" tax payments to February 28, 1971, the date of the option exercise, was stipulated to be $617,179.87. Tax payments received by Data Lease from the bank for the period under review by the Special Master would directly increase the net income of Data Lease in the amount of $1,264,966.30. It is apparent from the record that Data Lease and its subsidiary corporation received many financial benefits, while Blackhawk received nothing.
The trial court held that the above-quoted paragraph 6(b) of the option agreement was an essential part thereof, and that it was so vague, indefinite and uncertain as to render the entire agreement insufficient to justify specific performance. In addition, the Court held that even if the contract was not enforceable for the above-mentioned reasons, Blackhawk failed to properly exercise the option. Upon appeal, the District Court of Appeal affirmed the judgment of the trial court.
In the case of Shouse v. Doane, 39 Fla. 95, 21 So. 807 (1897), the following rule of contract interpretation was recognized by this Court:
"Where the terms of a written agreement are in any respect doubtful or uncertain, or if the contract contains no provisions on a given point, or if it fails to define with certainty the duties of the parties with respect to a particular matter or in a given emergency, and the parties to it have, by their own conduct, placed a construction upon it which is reasonable, such construction will be adopted by the court, upon the principle that it is the duty of the court to give effect to the intention of the parties where it is not wholly at variance with the correct legal interpretation of the terms of the contract." (p. 810)
The loan of credit by Blackhawk and Machata was a valuable consideration (see 17 C.J.S. Contracts, § 81) and financial benefits flowed to Data Lease as a result of this loan of credit. The parties intended that Blackhawk and Machata should receive a credit amounting to 25 per cent of these cash benefits derived by Data Lease. The only question is a determination of the amount of the cash benefits which were attributable to the loan of credit by Blackhawk. The fact that each possible cash benefit which might ensue was not listed with particularity should not destroy the agreement of the parties. The term "cash-flow benefit" should be construed in such a manner as to give the phrase a meaning consistent with the apparent object of the parties in entering into the contract. As stated by this Court in Gendzier v. Bielecki, 97 So.2d 604 (Fla. 1957),
"The making of a contract depends not on the agreement of two minds in one intention, but on the agreement of two sets of external signs  not on the parties having meant the same thing but on their having said the same thing." (p. 608)
Also, in St. Lucie County Bank & Trust Co. v. Aylin, 94 Fla. 528, 114 So. 438 (1927), this Court said:
"In the construction of written contracts it is the duty of the court, as near as may be, to place itself in the situation of the parties, and from a consideration of the surrounding circumstances, the occasion, and apparent object of the parties, to determine the meaning and intent of the language employed." (p. 441)
*408 The circumstances surrounding the negotiations and the object of the parties demonstrate that Blackhawk should have 25 per cent of the profit derived from Data Lease's ownership of the bank stock. The burden was upon the Court to make this determination after an examination of the books and records of Data Lease and its subsidiary corporations.
The decision of the District Court of Appeal in affirming the judgment dismissing the suit for specific performance was in conflict with the above decisions, and we have jurisdiction.
Data Lease relies upon Truly Nolen, Inc. v. Atlas Moving and Storage Warehouse, Inc., 125 So.2d 903 (Fla.App.3d, 1961), writ discharged 137 So.2d 568 (Fla. 1962), which holds that if an agreement is so vague and uncertain in the specifications of the subject matter that the Court cannot identify that subject matter or determine its quality, quantity or price, it will be unenforceable. This case involved "a latent ambiguity in the meaning of an essential word," which was not reconciled by construction of the parties. In the instant case, the agreement and the conduct of the parties clearly establishes the meaning of the term "cash-flow benefit." At the time of the final hearing, the trial court had before it the findings of the Special Master which defined with particularity the financial effects growing out of the option agreement. The duty of the trial court was to relate the findings of the Special Master to the established Florida law in the construction of contracts and determine the amount, if any, required for the exercise of the option.
Although it has been held that there can be no contract where the offeror, using ambiguous language, reasonably means one thing and the offeree reasonably understands differently, it has been held, however,
"[T]hat the fact that an executed written contract contains within itself difficulties of construction about which the parties disagree does not enable the parties to contend that the minds of the parties never met, since by signing the writing the parties bind themselves to such interpretation as the court may place upon the words and symbols employed by them." 17 Am.Jur.2d, Contracts, § 22, at 359.
Even though all the details are not definitely fixed, an agreement may be binding if the parties agree on the essential terms and seriously understand and intend the agreement to be binding on them. A subsequent difference as to the construction of the contract does not affect the validity of the contract or indicate the minds of the parties did not meet with respect thereto. 17 C.J.S. Contracts § 31.
The aforementioned rule of law has been codified with respect to sales, with the adoption in Florida of the Uniform Commercial Code. Fla. Stat. § 672.2-204, F.S.A. However, the statute relates to a contract for the sale of goods.
"(1) A contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract.
"(2) An agreement sufficient to constitute a contract for sale may be found even though the moment of its making is undetermined.
"(3) Even though one or more terms are left open a contract for sale does not fail for indefiniteness if the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy." (Emphasis supplied.)
The courts should be extremely hesitant in holding a contract void for indefiniteness, particularly where one party has performed under the contract and allowed the other party to obtain the benefit of his performance.
*409 In exchange for signing the $2,000,000 note in connection with the new loan from the Pension Fund, Blackhawk was to eventually acquire 25 per cent of Data Lease's 80 per cent interest in the Miami National Bank. This was the agreement and the intent of all the parties.
The term "cash-flow benefit" was intended to include the income derived by Data Lease from its continued holding of the bank stock, for, by use of the option agreement instead of the straight sale of stock to Blackhawk, Data Lease was able to gain financially. Blackhawk should participate.
As Professor Corbin stated in his treatise, Corbin on Contracts, Vol. 1 (1963), § 97, at 424:
"If the parties provide a practicable, objective method for determining this price or compensation, not leaving it to the future will of the parties themselves, there is no such indefiniteness or uncertainty as will prevent the agreement from being an enforceable contract."
The contract should not be held void for uncertainty unless there is no other way out. As was stated by Justice Cardozo in Heyman Cohen & Sons, Inc. v. M. Lurie Woolen Co., Inc., 232 N.Y. 112, 133 N.E. 370, 371, "Indefiniteness must reach the point where construction becomes futile."
Again turning to Professor Corbin, he states at § 95, page 400:
"If the parties have concluded a transaction in which it appears they intend to make a contract, the court should not frustrate their intention if it is possible to reach a fair and just result, even though this requires a choice among conflicting meanings and the filling of some gaps that the parties have left."
Williston on Contracts, (3rd Edition, 1968), Vol. 11, § 1424, page 813, states:
"The law does not favor, but leans against the destruction of contracts because of uncertainty; and it will, if feasible, so construe agreements as to carry into effect the reasonable intentions of the parties if that can be ascertained."
Professor Corbin again states at § 95, page 396:
"In considering expressions of agreement, the court must not hold the parties to some impossible, or ideal, or unusual standard. It must take language as it is and people as they are. All agreements have some degree of indefiniteness and some degree of uncertainty."
Professor Williston states at page 819:
"It seems probable that the difficulty regarding uncertainty has been overemphasized; certainly, it should not be allowed to hamper or restrict equitable relief further than necessity requires." (Emphasis supplied.)
In Stone v. Barnes-Jackson Co., Inc., 129 Fla. 816, 176 So. 767 (1937), this Court held that specific performance could be granted on an oral contract to execute a lease "in the usual form customarily used in Miami."
The option agreement in the case sub judice was not so uncertain in its terms as to require dismissal of the specific performance suit.
The trial court also held that the option was not properly exercised in that cash payments were not made upon the exercise of the option. Where a dispute exists as to the amount of money to be paid on the exercise of an option, such a dispute does not vitiate an otherwise perfectly valid exercise of the option, particularly where, as here, the calculation of both the total price and the amount due at closing involved highly complex accounting computations. See MacArthur v. North Palm Beach Utilities, Inc., 202 So.2d 181 (Fla. 1967). Where there is a valid dispute, the holder of the option is not obligated to pay the price demanded by the optionor or risk losing his option. To hold otherwise *410 would be to give every optionor a sword to hold over the head of every optionee.
In addition, it appears that Data Lease was making performance impossible in refusing to allow a review of its books and records. There was no way for Blackhawk to know the exact amount to be paid upon the exercise of the option. As stated in Sharp v. Williams, 141 Fla. 1, 192 So. 476, 480 (1939):
"`When a party stipulates that another shall do a certain thing, he thereby impliedly promises that he will himself do nothing which will hinder or obstruct that other in doing that thing' (Gay v. Blanchard, 32 La. Ann. 497, quoted with approval in Patterson v. Meyerhofer, 204 N.Y. 96, 97 N.E. 472); and indeed if the situation is such that the cooperation of one party is an essential prerequisite to performance by the other, there is not only a condition implied in fact qualifying the promise of the latter, but also an implied promise by the former to give the necessary cooperation."
See also Melvin v. West, 107 So.2d 156, 160 (Fla.App.2d, 1958).
The trial court erred in holding that the option was not properly exercised.
This case was before the equity side of the trial court, and the gross inequity of Data Lease's position is most apparent. It has gained financially after Blackhawk rescued it from financial disaster. At the same time Blackhawk has received nothing except a $2,000,000 debt. The effect of the District Court of Appeal's decision is to allow the defendant, Data Lease, to inequitably obtain the benefit of $2,000,000 of plaintiffs' financial credit and at the same time bar the plaintiffs from their rights under the contract.
The decision of the District Court of Appeal is quashed and this cause is remanded to the District Court of Appeal with instructions to further remand same to the trial court for the purpose of determining the rights of the parties under the contract.
It is so ordered.
ERVIN, McCAIN and DEKLE, JJ., concur.
OVERTON, J., dissents with opinion.
OVERTON, Justice (dissenting).
It is my opinion that there is no conflict on the same point of law to justify this Court taking jurisdiction of this cause.
On the merits, it is my opinion that the holding of the trial court and the unanimous affirmance by the Fourth District Court of Appeal should be sustained and the petitioner relegated to its remedy at law.
The petitioner has sought specific performance of a unique and involved stock option agreement. It is uncontroverted, and the trial court so found, that the petitioner, Blackhawk, in exercising its option to purchase the subject stock, failed to furnish the respondent, Data Lease, with the cash payment, assumption agreement, or promissory note, but, in lieu thereof, demanded instruments for execution and deductions from the purchase price. These deductions were claimed under the provisions of paragraph 6(b) of the agreement, which provided as follows:
"Any cash flow benefit, including any tax benefits, derived by Data as a consequence of its holding, hypothecation, assignment, pledge, etc. of MNB Stock shall inure proportionately to Blackhawk in the calculation of any payments due between the parties."
In considering the applicability of this paragraph to the asserted deductions claimed by petitioner-Blackhawk, the trial court said:
"... The parties were under pressure from the above-mentioned fund *411 to close the loan that day, and though they discussed the `cash flow benefits' idea, no one seemed certain just what was included therein. In any event, paragraph 6(b) was written into the agreement with the idea that it would be more clearly defined and elaborated upon later.
"The evidence shows that the parties were never subsequently able to agree upon the meaning of those terms. The terms `cash flow benefits', have no fixed meaning in accounting circles, and the parol evidence adduced fails to demonstrate the intention of the parties with the clarity necessary to justify specific performance."
The petitioner-Blackhawk, in asserting its demands under this "cash flow theory," claimed a reduction of its purchase price by the amount of all future interest required to be paid upon loans it was assuming. The trial judge characterized this demand as:
"... [P]erhaps the most unusual of its demands was its insistence upon reducing its purchase price to defendant by the amount of all future interest which it would be required to pay under the agreement on the outstanding loans, a percentage of which it was assuming."
The contention that future interest was a deductible item under the cash flow theory never surfaced until notice to exercise the option was given. In these proceedings the petitioner, Blackhawk, presented evidence that it would not exercise the option if this deduction were not allowed.
It is my opinion that the findings of fact made by the trial judge are fully justified by the evidence and his conclusions of law have a solid foundation in the law of specific performance existing in this state.
The majority opinion, holding in essence that equity should intervene to rewrite the contract in order to make sure that Data Lease is not unjustly enriched, sets a new precedent in the field of specific performance.
I would discharge the writ and affirm the trial court and the District Court of Appeal.