Steven G. MILES, Plaintiff,

v.

**NORTHWESTERN MUTUAL LIFE
INSURANCE COMPANY,**
Defendant.

**No. 6:08–cv–79–Orl–18DAB.**

United States District Court,
M.D. Florida,
Orlando Division.

Dec. 21, 2009.

Michael John Walker, R. Matthews Miles, Jr., R. Matthews Miles, Jr., P.A., Holly Hill, FL, W. Riley Allen, Allen & Murphy, PA, Orlando, FL, for Plaintiff.

Sarah G. Maroon, Timothy Joseph McDermott, Akerman Senterfitt, Jacksonville, FL, for Defendant.

## ORDER

G. KENDALL SHARP, Senior District Judge.

THIS CAUSE comes before the Court upon Defendant Northwestern Mutual Life Insurance Company's ("NML") Motion to Enforce Settlement (Doc. 108, filed Oct. 15, 2009) to which Plaintiff Steven G. Miles responded in opposition (Doc. 114, filed Nov. 19, 2009). For the following reasons, the Court denies NML's motion.

### Background

This case was set for trial on Tuesday, September 22, 2009. The issue to be tried was whether Plaintiff was "totally disabled" within the meaning of three occupational disability policies. The Friday prior to trial, the parties' counsel engaged in settlement negotiations. NML's counsel, Timothy McDermott, sent Plaintiff's counsel, Michael Walker, the following e-mail:

I received your counter offer and have called my client after hours and have discussed it with them. Per my telephone discussion with you a few minutes ago, here is NML's counter to yours:
1. NML would agree to pay Dr. Miles a total of $[redacted] in total satisfaction of his claims to date, which would include any and all claims for fees, unpaid monthly benefits to date, etc;

2. Going forward from the present (i.e., from and after September 18, 2009), NML would agree to pay him on claim at 50% of his total benefit amount under all three DI policies, with the agreement that he is free to submit proof of loss in any month going forward (after September, 2009) to establish an entitlement under the provisions of the contracts to a benefit amount up to 100%, with the agreement on his part that all three policies would end and terminate at the earlier of his death or age 65 (currently 2 of the three policies terminate at age 65). (The first 50% benefit would be paid on or about October 18, 2009). It is agreed that in the event that Dr. Miles believes in the future that he has experienced a change in his medical condition or financial status that would render him eligible to qualify for a benefit of greater than the 50% benefit agreed to by the parties, it would be Dr. Miles' affirmative obligation to notify NML in writing at that time and present NML with an Amended Claim/Proof of Loss at that time. NML would be obligated to evaluate his Amended Claim in good faith and in accordance with the terms of the policies. It is agreed that unless and until such an Amended Claim occurs, NML would have no obligation to administer his existing 50% claim, as NML would be entitled per this agreement to assume the "status quo" of his current medical and financial status remains in effect, unless such an Amended Claim/Proof of Loss occurs. Except as modified by the terms of this settlement agreement, the provisions of the three policies would remain in effect going forward.

3. NML would waive premium payments on those three DI policies as well;

4. Confidentiality and non-disparagement provisions; and

5. A release from Dr. Miles in favor of NML, its agents, employees, counsel, etc., for any and all claims arising out of this action, and the three disability policies, as well as any other claims of any type through the date of this Settlement, whether based on contract, common law, statute, 'bad faith', or otherwise. Dr. Miles would also file a dismissal of the action, with prejudice. Dr. Miles does not release NML of any claims going forward, arising after settlement, for any breach of the performance by NML of the terms of this settlement, or for any rights under his disability income policies that are not otherwise affected by the terms of this Agreement.

(Doc. 108 at 2–3.) At the end of the e-mail, McDermott wrote: "Given the imminence of the trial, and the need to prepare an agreement if this is acceptable, could I respectfully ask you to discuss this with Dr. Miles and let me know at your earliest opportunity." (*Id.* at 4.)

Shortly thereafter, Walker wrote McDermott that "Dr. Miles accepts your client's offer as set forth [above]." (*Id.*) McDermott then responded thanking Walker for his acceptance on his client's behalf and asking him if he would file a notice of settlement with the Court over the weekend. Walker complied, and the notice of settlement was filed on Saturday, September 19, 2009.

On September 22, 2009, McDermott sent Walker an e-mail stating that "I attached the draft Settlement Agreement and Release that sets forth the terms of the agreement. Please advise if acceptable and have Dr. Miles sign and return, and I will get NML to sign." (*Id.* at 5.) On September 24, after several follow ups from McDermott, Walker responded that "I am reviewing the paper work and will get back to you early next week." (*Id.*)

Rather than outlining his objections to the draft, Walker sent McDermott an e-mail with a proposed release signed by him that differed from the NML draft. When asked by McDermott what his concern was with the NML draft, Walker replied on September 28 with an e-mail stating that:

I carefully reviewed the "Settlement Agreement and Release" which you prepared. It varies substantially from the agreement we reached and attempts to add additional terms which are not part of our agreement.... **The e-mail correspondence is the contract. Dr. Miles owes you a release as contemplated by the e-mailed offer, but other than than [sic] that you don't really need anything further.**

(*Id.* at 7.) Counsel for both parties conferred by telephone on September 29, 2009 to work our their differences. Among other things, Walker objected to NML's position that the draft agreement sent on September 22 confirmed Plaintiff's status as partially disabled for the duration of the policies. The parties then agreed to engage in further discussions.

The last communication received by McDermott from Walker was an October 1, 2009 fax enclosing Walker's version of the settlement agreement, signed by Plaintiff, with a cover letter directing NML to transmit the settlement proceeds.

On October 7, 2009, McDermott sent Walker a revised draft agreement and notified him that the settlement discussions were concluded. Because Plaintiff has since failed to execute the agreement, NML filed the instant motion requesting the Court to: (1) reopen the case for the purpose of enforcing the settlement entered into by the parties and direct Plaintiff to execute the draft settlement agreement and release provided to Plaintiff on October 7, 2009; or (2) in the alternative,

vacate the dismissal Order and set the case for trial.

### Discussion

■■■ This Court possesses the inherent authority to summarily enforce a settlement agreement. *Ford v. Citizens & Southern Nat'l Bank*, 928 F.2d 1118, 1121 (11th Cir.1991). As always, settlements are highly favored as a means of conserving judicial resources and will be enforced when possible. *Murchison v. Grand Cypress Hotel Corp.*, 13 F.3d 1483, 1486 (11th Cir.1994). The party seeking to enforce a settlement agreement bears the burden of showing that the opposing party assented to the terms of the agreement. *Carroll v. Carroll*, 532 So.2d 1109, 1109 (Fla. 4th DCA 1988).

■■■ Because this is a diversity action, this Court must look to Florida law in determining whether an enforceable settlement agreement was reached in the first instance. *B.P. Prods. N. Am. v. Oakridge at Winegard, Inc.*, 469 F.Supp.2d 1128, 1132–33 (M.D.Fla.2007). Settlements, as agreements, are governed by the principles of Florida contract law. *Schwartz v. Fla. Bd. of Regents*, 807 F.2d 901, 905 (11th Cir.1987). Under Florida law, courts apply an objective test in deciding whether an enforceable contract exists. *Robbie v. City of Miami*, 469 So.2d 1384, 1385 (Fla. 1985) (noting that it matters not whether there was "the agreement of two minds in one intention, but on the agreement of two sets of external signs—not on the parties having meant the same thing but on their having said the same thing."). "The creation of a contract requires that there be mutual assent to a certain and definite proposition." *ABC Liquors, Inc. v. Centimark Corp.*, 967 So.2d 1053, 1056 (Fla. 5th DCA 2007). If a purported agreement leaves open its essential terms for future negotiation, or merely constitutes an agreement to agree, then there is no enforceable contract. *WrestleReunion, LLC v. Live Nation Television Holdings, Inc.*, No. 8:07–cv–2093–JDW–MAP, 2009 WL 2473686, at *4, 2009 U.S. Dist. LEXIS 70285, at *10–11 (M.D.Fla. Aug. 11, 2009); *ABC Liquors*, 967 So.2d at 1056. Nevertheless, "what constitutes an essential term of a contract will vary widely according to the nature and complexity of each transaction and must be evaluated on a specific basis." *ABC Liquors*, 967 So.2d at 1056.

■■■ The Court concludes that the September 18, 2009 e-mail constitutes a complete, binding, and enforceable settlement agreement. A review of the record makes clear that the parties "said the same thing" regarding all of the essential elements of the agreement. *Robbie*, 469 So.2d at 1385.

Neither party disputes that they agreed to resolve their claims. McDermott's September 18, 2009 e-mail was a definite counteroffer and Walker's response stating that "Dr. Miles accepts your client's offer as set forth [in the e-mail]" was an absolute and unconditional acceptance of the offer. The terms of the agreement include a lump sum payment, a plan for future payments under the policies, a release in favor of NML, and a dismissal with prejudice of all claims through the date of the settlement. (Doc. 108 at 3.)

Moreover, the settlement agreement contained all the essential terms of the agreement. That the confidentiality and non-disparagement terms of the agreement were not fully expounded is immaterial. Rather than being essential, these provisions go towards how the agreement will be implemented going forward. *Blackhawk Heating & Plumbing Co., Inc. v. Data Lease Fin. Corp.*, 302 So.2d 404, 408 (Fla.1974) ("Even though all the details are not definitely fixed, an agreement may be binding if the parties agree on the

essential terms and seriously understand and intend the agreement to be binding on them."). Similarly, the fact that the e-mail mentions the drafting of a release does not negate the binding nature of the agreement as a release "would have merely memorialized the essential terms to which the parties had previously agreed." *Sands v. Wagner & Hunt, P.A.*, No. 09–60557–CIV–DIMITRIOULEAS/SELTZER, 2009 WL 2730469, at *4 n. 7, 2009 U.S. Dist. LEXIS 77169, at *14 n. 7 (S.D.Fla. Aug. 28, 2009); *Hanson v. Maxfield*, 23 So.3d 736, 739 (Fla. 1st DCA 2009). The same holds true for the e-mail's contemplation of a formal agreement fleshing out the essential terms. "Where the parties intend that there will be no binding contract until the negotiations are reduced to a formal writing, there is no contract until that time." *Club Eden Roc, Inc. v. Tripmasters, Inc.*, 471 So.2d 1322, 1324 (Fla. 3d DCA 1985). There is no evidence of such an intent here, however. Instead, the parties' agreement to file a notice of settlement with this Court and cancel the trial prior to the completion of a formally executed document demonstrates an intent to be bound by the terms of the September 18, 2009 e-mail. Indeed, the Notice of Settlement states that the parties *have settled* their dispute. *Am. Capital Network v. Command Credit Corp.*, 707 So.2d 874, 875 (Fla. 4th DCA 1998).

To be sure, NML readily concedes the above in its motion to enforce the settlement. NML states that "[t]he parties reached a binding settlement agreement to resolve their dispute as evidenced by the September 18, 2009 e-mail exchange between counsel. Those e-mails conveyed the essential terms of the agreement and the acceptance." (Doc. 108 at 15.) NML asks the Court to go one step further and order Plaintiff to execute NML's draft settlement agreement memorializing its interpretation of the essential terms. NML

argues that this is necessary to prevent Plaintiff from re-litigating the total disability issue in another venue as soon as he receives the lump sum payment. According to NML, it did not offer this payment in exchange for deferring the dispute to subsequent litigation, and without the certainty that an executed draft agreement provides it will not receive consideration. (*Id.* at 13–15.)

The Court declines NML's invitation. NML essentially argues that without Plaintiff's execution of the draft agreement, there is no binding contract. *See Med–Star Cent. v. Psychiatric Hosps.*, 639 So.2d 636, 637 (Fla. 5th DCA 1994) (noting that the essential elements of a contract are offer, acceptance, and consideration). To begin with, NML's subjective intent in offering the lump sum payment is irrelevant to the Court's consideration of this issue. *Robbie*, 469 So.2d at 1385 (objective test used to determine if parties have agreed on two sets of external signs). NML has also received consideration for its payment in the form of Plaintiff's agreement to dismiss its current action for total disability payments *with prejudice*. *Diaz v. Rood*, 851 So.2d 843, 846 (Fla. 2d DCA 2003) ("It is clear that a promise, no matter how slight, can constitute sufficient consideration so long as a party agrees to do something that they are not bound to do.").

Furthermore, ordering Plaintiff to execute NML's draft is unnecessary. Given NML's concession that the September 18, 2009 e-mails constituted a binding agreement, the execution of a formal settlement draft was not a condition precedent to the agreement's enforceability, but merely a procedural formality. *Boyko v. Ilardi*, 613 So.2d 103, 104 (Fla. 3d DCA 1993). If, as NML contends, its draft merely memorializes the e-mail agreement in a formal document, then Plaintiff would already be

bound by NML's interpretations. Finally, the Court will not endorse NML's interpretation of the settlement agreement in order to stave off a hypothetical dispute over the settlement's language that may or may not come to fruition. *Ass'n for Children for Enforcement of Support, Inc. v. Conger*, 899 F.2d 1164, 1165 (11th Cir. 1990) ("It is axiomatic that federal courts should avoid premature adjudication of abstract or hypothetical disputes."). NML is free to argue its position if, and when, such a concrete controversy becomes ripe for adjudication.

Because both parties assented to the terms of September 18, 2009 e-mail from McDermott to Walker, a binding agreement was reached to settle this case on the terms articulated in that e-mail.

### Conclusion

For the foregoing reasons, it is hereby **ORDERED** and **ADJUDGED** as follows:

1. Defendant Northwestern Mutual Life Insurance Company's Motion to Enforce Settlement (Doc. 108) by having Plaintiff Steven G. Miles execute its draft agreement is **DENIED.**

2. The September 18, 2009 e-mail from Timothy McDermott to Michael Walker entered into the record at Document 108-2, page 12, is the operative settlement agreement in effect between the two parties and constitutes a binding contract to which both parties shall adhere. The parties are **DIRECTED** to comply with the terms of that agreement within a reasonable time period.

3. Pursuant to the valid settlement reached in this case, the above-referenced action is **DISMISSED with prejudice.**

4. The Clerk of Court is directed to **CLOSE** this case.