[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 22-11752

_____

BRANDON BLUHM,

Plaintiff-Counter Defendant-Appellant,

*versus*

WYNDHAM DESTINATIONS, INC., et al.,

Defendants,

WYNDHAM VACATION OWNERSHIP, INC.,
a Delaware corporation,
WYNDHAM VACATION RESORTS, INC.,
a Delaware corporation,
EXTRA HOLIDAYS, LLC,
FAIRSHARE VACATION OWNERS ASSOCIATION,

Defendants-Counter Claimants-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 6:19-cv-02300-WWB-LHP

_____

Before JORDAN, LAGOA, Circuit Judges, and CANNON,* District Judge.

PER CURIAM:

Defendants Wyndham Vacation Ownership, Inc. ("WVO") and Wyndham Vacation Resorts, Inc. ("WVR," and together with WVO, "Wyndham") develop and manage timeshare properties. Because Wyndham runs its timeshare program primarily for timeshare owners' personal use, it generally prohibits those owners from profiting by using their Wyndham interests. But on the occasions that Wyndham's timeshare owners cannot use their timeshare rights before the year is out, Wyndham permits owners to rent their otherwise unusable timeshare rights to friends and family members through its "Extra Holidays" program.

Plaintiff Brandon Bluhm misused Extra Holidays to run a for-profit business. When Wyndham discovered Bluhm's misuse,

_____

* Honorable Aileen M. Cannon, United States District Judge for the Southern District of Florida, sitting by designation.

a lawsuit ensued, which resulted in a negotiated settlement with Bluhm.  This appeal concerns whether that settlement agreement is a valid contract.  The district court concluded that it was and granted summary judgment in favor of Defendants.  After a careful review of the record, and with the benefit of oral argument, we affirm.

## I.    BACKGROUND

### A.  Bluhm Purchases and Rents Timeshare Properties.

WVO and WVR develop and manage timeshare resorts. Buyers of Wyndham timeshare interests enter into Purchase Agreements with WVR.  In those Purchase Agreements, buyers represent that they are "purchasing an Ownership for the purposes of recreational and social use, and not for financial profit."  Wyndham maintains a points-based system for managing owners' timeshare interests.  Over several years before 2017, Bluhm acquired an astonishing number of Wyndham timeshare interests—about seventy interests worth eighteen million points.

Owners of Wyndham timeshare interests, like Bluhm, assign their use rights to a trust known as Club Wyndham Plus, which is governed by a Trust Agreement.  As provided by the Trust Agreement, Defendants Fairshare Vacation Owners Association ("Fairshare") and WVR, along with other Wyndham affiliates, are the settlors of the trust.  Fairshare is the trustee.  And the Club Wyndham Plus beneficiaries are Fairshare, WVR, other Wyndham affiliates, and "Members."  Members include "Wyndham and the holder of a right to occupy an Accommodation as a consequence

of such holder having his Property Interests (or the use rights therein) subjected to this Trust Agreement, and such holder's heirs, and permitted successors and assigns."[1] Club Wyndham Plus also maintains a members' directory, which advises members that "[t]he Program is for a Member's own personal use and enjoyment and not for any commercial purpose."

Additionally, section 2.02 of the Trust Agreement states that "[t]he purpose of the Trust shall be to secure for the Beneficiaries their respective rights and interests as set forth in this Trust Agreement and in the Purchase Agreements and/or Assignment Agreements executed by the Members." The Trust Agreement's choice-of-law clause provides that the Agreement is governed by Arkansas law.

Club Wyndham Plus members may make reservations to stay at Wyndham properties through WVR. WVR manages the trust's reservation system. An agreement between Fairshare and WVR's predecessor in interest (the "Management Agreement") contains "[r]ecitals," one of which states that Fairshare "desires to engage Manager to manage and operate the Trust . . . and provide access to the Manager's Reservation System to the Members," while the management entity "desires to accept such engagement, all on the terms and conditions set forth below." Neither Bluhm nor any other Club Wyndham Plus member signed the Management Agreement. And neither the Management Agreement nor

---

[1] There is no dispute that Bluhm was a Wyndham member at all times relevant to this suit.

the Trust Agreement further defines the term "Manager's Reservation System."

Defendant Extra Holidays, LLC, is another Wyndham affiliate and runs Wyndham's "Extra Holidays" program. Through Extra Holidays, timeshare owners can rent out their unused vacation time to third parties in exchange for a cut of the revenue. Wyndham and Extra Holidays encouraged Bluhm and other members to pursue the Extra Holidays program's benefits. For example, in a letter to Bluhm, Extra Holidays described itself as "a powerful tool to provide you with income opportunities for your unused vacation weeks/points, which, if you choose, can be used to partially offset your maintenance fee expense."

But this encouragement was qualified. Owners who rented through Extra Holidays signed Listing Agreements. Those contracts provided:

> This rental program has been designed as your last "non-vacation" option. Timeshares are purchased for vacationing; an opportunity to enjoy special moments with family and friends. The first choice should always be to use or exchange your vacation reservation every year. And, of course, you always have the option of letting a friend or relative use your vacation reservation if you are unable to do so. Your last choice should be to rent your vacation. However, we know that vacations are not always possible, and if you can't use all or part of your vacation reservation this year, Extra Holidays can assist you.

> The Extra Holidays Vacation Time Listing Program . . . has been designed to try to provide you with some income for your unused vacation reservation. This is not a "get rich quick" program and you are not excused from your financial obligations to your association, but rather this is a service provided to help prevent any vacation from going unused.

Bluhm did not heed these instructions. He routinely rented his timeshare interests through Extra Holidays to turn a profit. In doing so, Bluhm referred to his operation as a "business" and registered a limited liability company. Bluhm ultimately grossed hundreds of thousands of dollars from this timeshare venture. And he freely admitted during his deposition that he was running a for-profit enterprise through Extra Holidays; in fact, in this lawsuit, Bluhm sought lost profits from that enterprise as damages.

But Bluhm's for-profit venture ran into trouble around May 2017. At that time, WVR began using an updated online reservation system. One of the new system's capabilities was the systemic enforcement of Club Wyndham Plus rules. So Bluhm began experiencing difficulty accessing the system, often finding himself locked out of his account. When he complained, Wyndham was accommodating—at first. Wyndham representatives helped Bluhm make several over-the-phone reservations when he could not access his online account. And several times, Wyndham compensated Bluhm for his access troubles by giving him additional timeshare points. But Bluhm remained largely locked out of his online Wyndham account between May and October 2017.

In July 2017, Bluhm began discussing payment and access issues with Wyndham representative Andres Mosquera. Wyndham communicated internally about potential litigation with Bluhm around the same time. Bluhm claims that Mosquera told him that Bluhm could regain access to the online reservation system only by divesting himself of a majority of his points—keeping only about five million. Bluhm attests that he was "under financial pressure" to regain online access, so he acquiesced to deeding back many of his points.

Bluhm insists that Wyndham could have easily permitted him to access his account. Mosquera testified at his deposition that he did not personally lock Bluhm's account, but he stated that he "probably reached out to someone else to lock up the account." Mosquera also testified that he "assume[d]" that unblocking an account would only require pressing a button.

## B. The Parties Enter into the Settlement Agreement.

Bluhm and Mosquera spoke on the phone on August 16, 2017. Mosquera emailed Bluhm later that day, attaching an "agreement [they] spoke about." Mosquera wrote that the document "lists the conditions of the agreement, along with the purchased interests and the retained interests." Mosquera told Bluhm that "[a]ll parties mentioned have to sign the agreement and the document needs to be notarized." Mosquera then assured Bluhm that, once the agreement was executed, he would "begin the process to take care of the loan and right size [Bluhm's] account."

Bluhm read over the document and replied to Mosquera's email, asking Mosquera for a phone call to discuss a "question" Bluhm had.  The two spoke again on the phone, and later, Bluhm emailed Mosquera asking Mosquera to put "in writing . . . what we spoke about."  Bluhm's email also called several paragraphs of the proposed agreement "vague."  Mosquera replied that "the agreement states that you may not engage in any commercial activity with your Wyndham account, including Extra Holidays," but that "[i]f you do run into a situation where you have some points left over and will not have use for them, it is ok to put those into Extra Holidays as that is the intended use of the program."

On August 31, 2017, Bluhm signed the proposed agreement (the "Settlement Agreement") with WVO.  Bluhm testified that he didn't show the Settlement Agreement to any lawyer before signing it because he had "[n]o time" to do so.  He called it "a matter of importance to hurry up and get [the Settlement Agreement] back to" Mosquera.

The Settlement Agreement relieved Bluhm of nearly $200,000 in debt to Wyndham.  Bluhm, in turn, sold back most of his timeshare points but kept a defined group of timeshare interests that the Settlement Agreement referred to as "Retained Interests."  Bluhm also agreed "not to engage in any commercial conduct of any type as part of [his] use of the Retained Interests, which would include the use of Extra Holidays, or any other Wyndham related entity, for the rental of [his] Retained Interests."  Bluhm testified at his deposition that he understood this provision to limit his use of

Extra Holidays to less "activity [than] in the past" and that his previous "activity that [he] had was too much." He testified that he knew "there was going to be some limit on [his] ability to use Extra Holidays." And he testified that he knew that the Settlement Agreement prohibited him from earning a profit using Extra Holidays. Bluhm's counsel likewise acknowledged at oral argument that Bluhm's pre-settlement level of Extra Holidays use would have been impermissible under the Settlement Agreement.

The Settlement Agreement contained mutual releases. The release in favor of Defendants provided:

> In consideration of the Agreement, [Bluhm] forever RELEASE[S], ACQUIT[S], DISCHARGE[S], AND AGREE[S] TO HOLD HARMLESS Wyndham, the Trusts, the Trustees, the Programs, and each of their agents, servants, affiliates, subsidiaries, parent entities, representatives, employees, directors, board members, shareholders, members, beneficiaries, officers, attorneys, and insurers, and all persons, firms, organizations or corporations in privity with the foregoing (even if such persons or entities are not specifically named in this Agreement), and the predecessors, successors, and assigns of each of them (collectively, the "Wyndham Releasees"), of and from any and all claims, demands, and causes of action owned or held by [Bluhm] . . . which arise from and/or result from or in any way relate to the Timeshare Interests, including but not limited to any claims based on any alleged representation or promise made to [Bluhm] by any current or former employee or agent of

Wyndham and/or the Trustees, its directors and officers, or any of the other Wyndham Releasees, and any and all claims to date, whether or not those claims were specifically included in this Agreement.

The Settlement Agreement is governed by Florida law.

### C. Bluhm Continues Renting Properties Through Extra Holidays and Sues Defendants.

The peace ostensibly brokered by the Settlement Agreement did not last long. In March 2018, Mosquera emailed Bluhm noting that Bluhm had "acquired a contract outside of our agreement" and that more than fifty percent of Bluhm's 2018 reservations were through Extra Holidays. Mosquera asserted that Bluhm's actions were "in direct violation of our agreement" because "[w]e agreed that you were only going to use Extra Holidays as a last resource and that is not what . . . appears to be happening." Bluhm stated at his deposition that it was probably true that fifty percent or more of his reservations were through Extra Holidays. Wyndham then blocked Bluhm's attempt to acquire a new timeshare interest.

Bluhm then sued Defendants and asserted claims under the Florida Deceptive and Unfair Trade Practices Act; common-law claims for breach of fiduciary duty, fraud, fraud in the inducement, fraudulent concealment, and negligence; a claim for breach of the Arkansas Trust Code; and claims for declaratory relief.[2] Bluhm's

---

[2] Bluhm first filed his suit against Defendants in the United States District Court for the Western District of Washington. That court eventually granted

claims for declaratory relief included allegations that the Settlement Agreement was void on various grounds, including that the Settlement Agreement is unconscionable, that Defendants fraudulently induced Bluhm into entering the Settlement Agreement, and that Bluhm entered the Settlement Agreement under duress. In response, Defendants claimed that Bluhm had released all of his claims against them. WVO and WVR also asserted counterclaims against Bluhm for breach of contract and fraudulent inducement.

Defendants moved for summary judgment on all claims, arguing that the Settlement Agreement's release nullified Bluhm's "right to bring this action in its entirety." In response, Bluhm contended that the Settlement Agreement was not binding because, among other reasons, (1) there was no meeting of the minds as to the Settlement Agreement's essential terms, (2) Mosquera fraudulently included Bluhm into signing the Settlement Agreement, and (3) Bluhm entered into the Settlement Agreement under duress.

On January 6, 2022, the district court granted summary judgment in favor of Defendants on Bluhm's claims but denied summary judgment as to Defendants' counterclaims.

After the district court entered it summary judgment order, the parties settled WVO and WVR's counterclaims against Bluhm. This partial settlement preserved Bluhm's right to appeal the

---

Defendants' motion to transfer the case to the United States District for the Middle District of Florida. Bluhm then filed his third amended complaint, which is the operative complaint here.

district court's entry of summary judgment against him.  Accordingly, Bluhm appealed.

## II.    STANDARD OF REVIEW

We review de novo a district court's order granting summary judgment.  *Mech v. Sch. Bd.*, 806 F.3d 1070, 1074 (11th Cir. 2015).  "Summary judgment is appropriate if 'the evidence before the court shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'"  *McCullough v. Antolini*, 559 F.3d 1201, 1204–05 (11th Cir. 2009) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)).

"[T]he initial burden is on the party seeking summary judgment to identify the portions of the record that it believes show the absence of a genuine issue of material fact and to show that it is entitled to judgment as a matter of law."  *Edmondson v. Velvet Lifestyles, LLC*, 43 F.4th 1153, 1160 (11th Cir. 2022).  "Once the movant adequately supports its motion, the burden shifts to the nonmoving party to show that specific facts exist that raise a genuine issue for trial."  *James River Ins. Co. v. Ultratec Special Effects Inc*, 22 F.4th 1246, 1251 (11th Cir. 2022) (quoting *Dietz v. Smithkline Beecham Corp.*, 598 F.3d 812, 815 (11th Cir. 2010)).  "When considering a motion for summary judgment, . . . 'courts must construe the facts and draw all inferences in the light most favorable to the nonmoving party and when conflicts arise between the facts evidenced by the parties, [they must] credit the nonmoving party's version.'"  *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1252 (11th Cir. 2013)

(second alteration in original) (quoting *Davis v. Williams*, 451 F.3d 759, 763 (11th Cir. 2006)).

## III.    ANALYSIS

On appeal, Bluhm argues that the district court erroneously shifted Defendants' summary-judgment burden onto him. He also asserts that genuine disputes of material fact precluded summary judgment as to three of his challenges to the Settlement Agreement's validity: (1) that there was no meeting of the minds on the commercial-use prohibition, which he argues was an essential term; (2) that Wyndham fraudulently induced him to enter the Settlement Agreement; and (3) that he entered the Settlement Agreement under duress. We address these arguments in turn.

### A. The District Court Did Not Improperly Shift the Summary-Judgment Burden onto Bluhm.

We turn first to Bluhm's argument that the district court improperly shifted the initial summary-judgment burden onto him by "presum[ing] the validity of the Settlement Agreement" without requiring Defendants to "address[] [his] claims" that the Settlement Agreement was invalid.

As the parties moving for summary judgment, Defendants—who raised the release as an affirmative defense—bore the burden of making a prima facie case that the Settlement Agreement was a valid contract. *See Edmondson*, 43 F.4th at 1160. Bluhm asserts that Defendants did not carry this burden and that the district court instead simply "presumed the validity of the Settlement Agreement." We disagree.

"Under Florida law, settlement agreements are interpreted and governed by principles of contract law." *Cableview Commc'ns of Jacksonville, Inc. v. Time Warner Cable Se., LLC*, 901 F.3d 1294, 1301 (11th Cir. 2018). "Florida contract law provides that a party may rescind an agreement for duress if that party can show that the contract 'was effected involuntarily and thus not as an exercise of free choice or will and . . . that this condition of mind was caused by some improper and coercive conduct of the opposite side.'" *Id.* (quoting *City of Miami v. Kory*, 394 So. 2d 494, 497 (Fla. Dist. Ct. App. 1981)). Therefore, when a party seeks to rescind a settlement agreement, that party has the burden to show that the other party "engaged in wrongful acts or threats that caused a situation in which it had no alternative." *See id.* Similarly, for a claim of fraudulent inducement, the party has the burden to show: "(1) a false statement concerning a material fact; (2) the representor's knowledge that the representation is false; (3) an intention that the representation induced another to act on it; and (4) consequent injury by the party acting in reliance on the representation." *Butler v. Yusem*, 44 So. 3d 102, 105 (Fla. 2010) (quoting *Johnson v. Davis*, 480 So. 2d 625, 627 (Fla. 1985)).

In his operative complaint, Bluhm alleged that Defendants fraudulently induced him into entering the Settlement Agreement and that he was under duress when he entered into that agreement. Thus, if the case had proceeded to trial, Bluhm would have had the burden of proving these claims. *See Cableview*, 901 F.3d at 1301; *Butler*, 44 So. 3d at 105.

But here, Defendants moved for summary judgment on Bluhm's claims. As the parties moving for summary judgment, Defendants therefore bore the initial burden of demonstrating that there was no genuine dispute of material fact and they were entitled to judgment as a matter of law. *See Edmondson*, 43 F.4th at 1160. But at the summary judgment stage, "the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). In their motion for summary judgment, Defendants did that by pointing to the language of the Settlement Agreement and arguing that it was not fraudulently induced. Indeed, Defendants argued that the Settlement Agreement was a valid contract because there was a meeting of the minds. And, in support of their argument, Defendants pointed to record evidence showing that Bluhm understood what he was agreeing to. At this point, the burden then shifted to Bluhm to show that there were genuine and disputed issues of material fact as to his claims of fraudulent inducement and duress. *See James River*, 22 F.4th at 1251.

In other words—and contrary to Bluhm's argument—the district court did not presume the validity of the Settlement Agreement and improperly shift the initial burden of proof to Bluhm. Defendants were not required to do more than show the absence of a genuine and material factual dispute regarding Bluhm's fraudulent inducement and duress claims before the burden shifted to Bluhm to show otherwise. *See Celotex*, 477 U.S. at 325; *James River*,

22 F.4th at 1251.  Accordingly, we reject Bluhm's argument that the district court presumed the validity of the Settlement Agreement and improperly shifted the initial burden of proof to Bluhm.

## B.  The Settlement Agreement Is Valid.

### 1.  *The District Court Correctly Concluded That the Parties' Minds Met as to the Settlement Agreement's Commercial-Use Prohibition.*

We next address Bluhm's argument that the Settlement Agreement's release was not enforceable because the parties never agreed on the meaning of a separate provision that barred Bluhm from using Extra Holidays for commercial purposes.  In support of this argument, Bluhm points to his own deposition testimony that he believed the word "commercial" referred only to advertising and similar activity (rather than simply any activity relating to commerce) and to his email to Mosquera asking for clarification of "vague areas" in the Settlement Agreement.  Bluhm also contends that the commercial-use prohibition was an essential term of the contract.  Bluhm thus maintains that the entire Settlement Agreement, including the release, is invalid because the parties' minds never met with respect to that essential term.

The existence of a contract is a question of law.  *L & H Constr. Co. v. Circle Redmont, Inc.*, 55 So. 3d 630, 634 (Fla. Dist. Ct. App. 2011).  For a contract to exist, there must be "mutual assent, or 'meeting of the minds,' on all the essential terms of the[] agreement."  *Sam Rodgers Props., Inc. v. Chmura*, 61 So. 3d 432, 437 (Fla. Dist. Ct. App. 2011).  Under Florida law, we must use "an objective

test . . . to determine whether a contract is enforceable." *Robbie v. City of Miami*, 469 So. 2d 1384, 1385 (Fla. 1985). That test requires an evaluation "of two sets of external signs—not on the parties having meant the same thing but on their having said the same thing." *Id.* (quoting *Blackhawk Heating & Plumbing Co. v. Data Lease Fin. Corp.*, 302 So. 2d 404, 407 (Fla. 1974)). Parties to a contract need not "nail[] down each and every detail" to form an enforceable contract, but the essential terms must be sufficiently definite. *ABC Liquors, Inc. v. Centimark Corp.*, 967 So. 2d 1053, 1057 (Fla. Dist. Ct. App. 2007).

The Settlement Agreement's commercial-use prohibition barred Bluhm from "engag[ing] in any commercial conduct of any type as part of [his] use of the Retained Interests, which would include the use of Extra Holidays, or any other Wyndham related entity, for the rental of [his] Retained Interests." Bluhm argues that the undefined phrase "commercial conduct" is too vague to satisfy the meeting-of-the-minds standard under Florida law, and he advances multiple hypotheticals to show how disputes over the meaning of the phrase might arise in the future.

Although we agree that the phrase "commercial conduct" is broad and potentially susceptible to multiple interpretations, mere ambiguity in an essential term of a contract does not preclude the parties from reaching a meeting of the minds.[3] *See Blackhawk*, 302 So. 2d at 408. The Florida Supreme Court has explained that "by

---

[3] We assume without deciding that the commercial-use prohibition was an essential term of the Settlement Agreement.

signing the writing the parties bind themselves to such interpreta-tion as the court may place upon the words and symbols employed by them." *Id.* Or, in other words, "[a] subsequent difference as to the construction of the contract does not affect the validity of the contract or indicate the minds of the parties did not meet with re-spect thereto." *Id.*

With these principles in mind, we turn to address Bluhm's meeting-of-the-minds argument. The undisputed record evidence shows that in agreeing to be bound the commercial-use prohibi-tion, Bluhm and Defendants mutually agreed to *something*. At oral argument, Bluhm's counsel conceded that the commercial-use pro-hibition at least forbade Bluhm from renting through Extra Holi-days at the level that he had been before the Settlement Agree-ment. Bluhm also admitted as much in his deposition. Addition-ally, while Bluhm questioned Mosquera about the meaning of the commercial-use prohibition before he signed the Settlement Agreement, he subsequently signed the Settlement Agreement. Bluhm's decision to do so shows that he understood—even after deliberation—that he was binding himself to avoid commercial use of his Extra Holidays rights. *See Don L. Tullis & Assocs., Inc. v. Benge*, 473 So. 2d 1384, 1386 (Fla. Dist. Ct. App. 1985) (affirming a jury's finding that a meeting of the minds occurred even when an alleg-edly essential term was left undefined because the "parties know-ingly, thoughtfully and deliberately entered th[e] agreement").

All told, the commercial-use prohibition "created a frame-work for resolving the parties' differences, rather than nailing

down each and every detail." *ABC Liquors*, 967 So. 2d at 1057. Under Florida law, this is enough to establish a meeting of the minds. *See id.* To the extent that Bluhm and Defendants disagree about the meaning of the commercial-use prohibition, they remain free to litigate that issue in the future. All that is at issue in this appeal is whether that prohibition is so ill-defined that it renders the entire Settlement Agreement—including the release—invalid. We conclude that it does not. In their written agreement, the parties here "said the same thing"—i.e., they entered into a written agreement with the same terms—so it does not matter for present purposes whether disputes over alleged ambiguities could arise later. *Gendzier v. Bielecki*, 97 So. 2d 604, 608 (Fla. 1957) (quoting Oliver Wendell Holmes, *The Path of the Law*, 10 Harv. L. Rev. 457, 464 (1897)). We thus conclude that the district court properly entered summary judgment for Defendants as to whether a meeting of the minds occurred.

### 2. The District Court Correctly Rejected Bluhm's Fraudulent-Inducement Argument.

We now address Bluhm's argument that a genuine dispute of material fact precluded the district court's entry of summary judgment as to his fraudulent-inducement argument. Bluhm contends that Wyndham obstructed his access to the online reservation system and that, after Wyndham did so, Mosquera materially misrepresented the reasons for the obstructed access. According to Bluhm, Mosquera led him to believe that Wyndham's "IT" issues—rather than its objections to Bluhm's misuse of Extra Holidays—was responsible for Bluhm's access difficulties. He claims

that Mosquera told him that he needed to sign the Settlement Agreement for his account to be unlocked as an IT matter, when, in reality, Wyndham could have easily enabled Bluhm to access his account as he had before.  Bluhm therefore argues that the Settlement Agreement is invalid because his decision to sign it was predicated on Mosquera's allegedly false representation that Wyndham could not enable Bluhm to make reservations online until he signed the Settlement Agreement.

Under Florida law, a party alleging fraudulent inducement must establish the following four elements: (1) a false statement about a material fact; (2) the representor's knowledge that the representation is false; (3) an intention that the representation induced another to act on it; and (4) resulting injury by the party acting in reliance on the representation.  *Dziegielewski v. Scalero*, 352 So. 3d 931, 934 (Fla. Dist. Ct. App. 2022).  Bluhm focuses on two subparts of the first element: falsity and materiality.  We will assume without deciding that Mosquera's statements to Bluhm, viewed in the light most favorable to Bluhm, were false.

The district court correctly concluded that Mosquera's statements were immaterial.  There is no dispute that even after Bluhm was locked out of his online Wyndham account, he was able to—and in fact did—make reservations on the phone through Wyndham representatives.  While making reservations that way might have been less efficient for Bluhm, he offers no explanation for why affording him access to over-the-phone reservation services was insufficient to meet any putative access obligations Wyndham had.

Bluhm also fails to show that Wyndham had a fiduciary or other obligation to grant him unfettered online access to the reservation system in the circumstances presented by the record. On appeal, Bluhm does not specify what law should apply to the question of whether WVR, as the manager of the trust, owed him a particular fiduciary duty. However, as Bluhm asserted below that Arkansas law governs the matter, and the Trust Agreement contains a choice-of-law clause in favor of Arkansas law, we will apply Arkansas law to determine whether Wyndham had a fiduciary obligation to afford Bluhm online access to Club Wyndham Plus. *See Fla. First Fin. Servs., LLC v. Randolph*, 350 So. 3d 820, 823 (Fla. Dist. Ct. App. 2022) (holding that under Florida's choice-of-law rules, a choice-of-law clause is presumptively enforceable); *see also Kinark Corp. v. Home Ins. Co.*, 68 F.3d 467, 1995 WL 581621, at *4 n.7 (5th Cir. 1995) (per curiam) (explaining that courts need not decide a choice-of-law issue when the judgment must be affirmed even under the appellant's chosen law).

To start with, there is no doubt that WVR, as the trustee's delegate, owed fiduciary duties of some sort to Bluhm. Bluhm is a "Member" as defined by the Trust Agreement, and members are beneficiaries of the trust. But—importantly—Wyndham, FVOA, and other affiliates are *also* Club Wyndham Plus beneficiaries. And the express purpose of the trust is "to secure for the Beneficiaries their respective rights and interests as set forth in this Trust Agreement *and in the Purchase Agreements and/or Assignment Agreements executed by the Members*." (Emphasis added).

The record evidence shows that Bluhm violated the Purchase Agreements—and, by extension, the purpose of the trust. There is no genuine dispute that Bluhm had for years used Extra Holidays to operate a for-profit business enterprise. Indeed, Bluhm admitted to such misuse at his deposition. And he also sought lost profits as damages in this lawsuit. But the Purchase Agreements Bluhm entered into forbade for-profit use, and the Extra Holidays Listing Agreements incorporated that prohibition.

The undisputed record evidence thus showed that the Club Wyndham Plus trustee (or its delegate) was not required to make it easier for Bluhm to continue to violate the express purpose of the trust by affording him access to the online reservation system that he had repeatedly misused. A trustee's duty is "to protect the interests of the beneficiaries, to manage the trust property, and to carry out the terms and purposes of the trust." *Hamilton v. Bank of the Ozarks*, 647 S.W.3d 113, 118 (Ark. Ct. App. 2022) (quoting *In re Hamilton Living Tr.*, 571 S.W.3d 53, 59 (Ark. Ct. App. 2019)). The purpose of the Club Wyndham Plus trust was to protect and enforce the Purchase Agreements that Bluhm was violating by using the online reservation system. And Bluhm points to no provision of the Trust Agreement—or any other agreement in the record— that expressly guaranteed him *online* access to the reservation system.

Thus, no agreement, and no principle of Arkansas law, required WVR to facilitate Bluhm's violation of the trust that WVR was appointed to manage. If anything, the law required the

opposite. Arkansas law imposes an obligation of impartiality on trustees and their delegates. *See, e.g.*, *Hardy v. Hardy*, 230 S.W. 2d 11, 16 (Ark. 1950) ("Where there are two or more beneficiaries of a trust, the trustee is under a duty to deal impartially with them." (quoting Restatement of the Law of Trusts § 183)); *First Nat'l Bank of Dewitt v. Yancey*, 826 S.W.2d 287, 289 (Ark. Ct. App. 1991) (recognizing a trustee's "fiduciary duty to deal impartially with multiple beneficiaries"). Impartially carrying out the purpose of a trust means effectuating that purpose without favoring one beneficiary over another. But if Bluhm is correct that WVR was required to grant him access to the online reservation system to run his for-profit business, WVR would necessarily be subordinating the trust's purpose to the improper activity of a single beneficiary—Bluhm.

In short, the undisputed record evidence shows that Bluhm was using the online reservation system to violate the Purchase Agreements and the purpose of the Club Wyndham Plus trust. Wyndham had no fiduciary obligation to facilitate these violations by allowing Bluhm continued online access to the system. Additionally, no provision of the Trust Agreement or any other document afforded members an unqualified right to online access. Thus, since Bluhm had no right to make reservations online anyway, Mosquera's statements about the reasons for Bluhm's restricted access were not material. We thus conclude that the district court did not err in finding that Wyndham's ability to "physically permit [Bluhm] access" to the online reservation system "is immaterial if Defendants had no obligation or intention of doing

so." We thus affirm the district court's entry of summary judgment to Defendants on this issue.

3. *The District Court Correctly Rejected Bluhm's Duress Argument.*

Last, Bluhm contends that the district court erred when it rejected Bluhm's duress argument because Wyndham exerted undue "financial pressure" on him to enter the Settlement Agreement. We conclude that this argument lacks merit.

Under Florida law, duress requires "improper external pressure or influence that practically destroys the free agency of a party and causes him to do an act or make a contract not of his own volition." *Cableview*, 901 F.3d at 1304 (quoting *Cooper v. Cooper*, 69 So. 2d 881, 883 (Fla. 1954)). But "'the pressure of financial circumstances' standing alone is insufficient to establish duress." *Id.* at 1304 n.7 (quoting *Spillers v. Five Points Guar. Bank*, 335 So. 2d 851, 853 (Fla. Dist. Ct. App. 1976)). Therefore, even assuming that Defendants were exerting "financial pressure" on Bluhm to enter the Settlement Agreement, that alone is not sufficient to establish he was under duress when he signed that agreement. We thus conclude that the district court did not err in granting summary judgment to Defendants on Bluhm's duress argument.

## IV.    CONCLUSION

For the reasons stated, we affirm the district court's grant of summary judgment to Defendants.

**AFFIRMED.**