**FOR PUBLICATION**

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 23-10197

_____

CREATIVE CHOICE HOMES XXX, LLC,

　a Florida limited liability company,
　f.k.a. Creative Choice Homes XXX, Inc.,

*Plaintiff-Counter Defendant-Appellant,*

*versus*

AMTAX HOLDINGS 690, LLC,

　a foreign limited liability company,

PROTECH 2005-C, LLC,

　a foreign limited liability company,

*Defendants-Counter Claimants-Appellees,*

IMPRO SYNERGIES LLC,

*Counter Defendant-Appellant.*

_____

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 8:19-cv-01903-TPB-AAS

_____

_____

No. 23-10198

_____

CREATIVE CHOICE HOMES XXXI, LLC,

A Florida corporation formerly known as
Creative Choice Homes XXXI, Inc.,

*Plaintiff-Counter Defendant-Appellant,*

*versus*

MG AFFORDABLEMASTER, LLC,

MG GTC MIDDLE TIER I, LLC,

MG GTC FUND I, LLC,

Foreign limited liability companies,

*Defendants-Counter Claimants-Appellees,*

NAIMISHA CONSTRUCTION, INC.,

*Defendant-Appellee,*

IMPRO SYNERGIES LLC,

*Counter Defendant-Appellant.*

_____

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 8:19-cv-01910-TPB-AAS

_____

Before ROSENBAUM, NEWSOM, and ABUDU, Circuit Judges.

ABUDU, Circuit Judge:

This consolidated appeal involves a dispute among several business entities engaged in two limited partnerships for building, managing, and selling affordable housing complexes. At the center of these partnerships are two affiliates of Creative Choice Homes, Inc. ("Creative Choice")—Creative Choice Homes XXX, LLC ("Creative Choice XXX") and Creative Choice Homes XXXI, LLC ("Creative Choice XXXI"), which each served as a "general partner" for one of the limited partnerships. After a series of financial transactions that even the general partners admitted violated the partnership agreements, the limited partners had the general partners removed from their positions. The general partners sued, arguing that their actions did not materially breach the agreements and that, in any event, they cured any deficiency. They also contended that the reason given for their ouster was just a pretext for trying to deprive the general partners of financial interests to which they otherwise were entitled under the partnership agreements. The district court rejected all their arguments and ruled in the limited partners' favor, thus enforcing the general partners' removal.

On appeal, Creative Choice XXX and Creative Choice XXXI (collectively, the "general partners"),[1] challenge the district court's decision on the grounds that the court's findings regarding their

---

[1] AMTAX, Protech, MG GTC, and MG Affordable are collectively referred to as the "limited partners."

curative acts and the materiality of the alleged breaches were clearly erroneous. They also assert that their removal resulted in an unlawful forfeiture and windfall of earnings for the limited partners. Finally, they argue that, by accepting their curative measures, the limited partners waived the option to remove them from office and, therefore, should have been estopped from enforcing that provision as a remedy to any breach.

After carefully reviewing the record and the parties' briefs, and with the benefit of oral argument, we affirm.

## I.    FACTUAL BACKGROUND

Relying on the district court's uncontested findings of fact, the testimony given during the three-day bench trial, the accompanying trial exhibits, and the two partnership agreements, we outline the structure of the two partnerships, recount the relevant factual background that led to the underlying dispute, and walk through the district court's proceedings.

### A. Structure of the Limited Partnerships

Creative Choice, founded and operated by Dilip Barot, develops affordable housing through limited partnership structures. Creative Choice XXX and Creative Choice XXXI created the Fountainview and Park Terrace partnerships, respectively, around 2002 to develop two affordable apartment complexes in Tampa, Florida. Creative Choice XXX served as the general partner for the Fountainview partnership, and Creative Choice XXXI served as the general partner for the Park Terrace partnership. For the Fountainview partnership, AMTAX Holdings 690, LLC ("AMTAX") was

the investor limited partner, and Protech 2005-C, LLC ("Protech") was the special limited partner. For the Park Terrace partnership, MG GTC Middle Tier I, LLC ("MG GTC") was the investor limited partner, and MG Affordable Master, LLC ("MG Affordable") was the special limited partner.

Both the Fountainview and Park Terrace partnership agreements authorized the general partners to select a management company and to make other decisions related to the properties' daily operations. The general partners hired Impro Synergies, LLC ("Impro") to manage both developments. Both partnership agreements also created a pay structure in which the general partners would be entitled to an annual incentive management fee, but those payments could only be distributed in accordance with the agreements' cash distribution or "waterfall" provisions. Pursuant to the waterfall provisions, the limited partners had to receive their share of the profits first, and then the general partners could be paid their management fee. The Fountainview agreement expressly prohibited Creative Choice XXX from borrowing any funds from the partnership accounts. In addition, given the multiple companies the general partners either owned or with which they were associated, both agreements also forbid them from commingling funds with other entities or individuals.

Both Agreements contemplated the general partner's removal from the partnership under certain circumstances. The relevant portions of the Fountainview Agreement's removal provision stated:

(a) The Investor Limited Partner and/or Special Limited Partner shall have the right to remove the General Partner:

    (i)    for any intentional misconduct, malfeasance, fraud, act outside the scope of its authority, breach of its fiduciary duty, or any failure to exercise reasonable care with respect to any material matter in the discharge of its duties and obligations as General Partner (provided that such violation results in, or is likely to result in, a material detriment to or an impairment of the Partnership, the Limited Partners, the Project, or the assets of the Partnership), or

    (ii)    upon the occurrence of any of the following: . . . .

    (B) The General Partner shall have violated any material provision of this Agreement including, without limitation, any of its guarantees pursuant to Section 5.1(d) or 8.8, or violated any material provision of applicable law (provided that such violation results in, or is likely to result in, a material detriment to or an impairment of the Partnership, the Limited Partners, the Project, or the assets of the Partnership).

The agreement required the Fountainview limited partners to give the general partner notice and an opportunity to cure before the removal took effect. The applicable period was either 30 days after the day of notice, or 60 days if the general partner diligently and consistently began to cure within the 30-day period.

23-10197              Opinion of the Court                7

The Park Terrace Agreement also permitted the limited partners to remove the general partner for any "Material Default" as defined in the Agreement, which included:

> (i)    a breach by any General Partner (or any of its Affiliates) . . . in the performance of any of its obligations under this Agreement . . . and which has, or may reasonably be expected to have, a material adverse effect on the Partnership, the Apartment Complex, or the Investor Limited Partner; [or] . . .

> (iv)    gross negligence, fraud, willful misconduct, misappropriation of Partnership funds, or a breach of fiduciary duty by a General Partner or any Affiliate of a General Partner providing services to or in connection with the Partnership or the Apartment Complex.[2]

For removal to be effective, the Park Terrace limited partners must have given the general partner notice of the cause for its removal. However, only "material defaults" under subsection (i) were subject to a right to a cure which, for monetary defaults, is 30 days from the notice of removal. Removals for material defects under

---

[2] The parties dispute whether both partnership agreements required a material detriment in order to remove a general partner for the reasons presented here. The district court did not decide whether materiality was required in each agreement because it found the general partners' conduct caused a material detriment. Similarly, we find the general partners' breaches material and do not need to decide whether both agreements required material harm for the violations here.

subsection (iv) took effect on the date of notice.  Under both agreements, if the general partner remained in the partnership until the end of the tax credit compliance period, it had the right to purchase the properties, or the limited partners' interest in the properties.

### B.  Limited Partnerships' Allegations of Malfeasance

Dating back to 2008, on the partnerships' audited financial statements, Baker Tilly, an auditing firm responsible for producing the audited financial statements, documented sums of money that the general partners took from the partnership through advances made to undisclosed general partners' affiliates.  This was marked as "due from affiliate" balances.  At least twice in 2012, the limited partners notified the general partners that these distributions violated the partnership agreements and demanded the funds be returned.[3]

The accounting and consulting firm Baker Tilly was hired to produce audited financial statements for the properties, and worked directly with the general partners in preparing those reports.  Baker Tilly's 2016 audit for the Fountainview partnership indicated that the partnership loaned an unspecified affiliate of Creative Choice XXX $140,577 and that, as of December 31, 2016, that loan was still outstanding.  In its report, Baker Tilly notified the

---

[3] Neither Creative Choice XXX nor Creative Choice XXXI objected to or otherwise contested the admissibility of this evidence.  Although only two email exhibits were shown at trial to demonstrate that the limited partners opposed the unauthorized affiliate payments before Hunt took control, a representative testified that the limited partners raised objections for years.

general partners that the loan violated the partnership agreement, specifically the waterfall provision.

Baker Tilly's 2016 audit for the Park Terrace partnership similarly showed a loan to an affiliate of Creative Choice XXXI for the amount of $81,198 and that, as of December 31, 2016, the loan had not been paid. This audit also notified the general partners that the payment violated the partnership agreement's waterfall provision.

In March 2018, Baker Tilly circulated a draft of its 2017 audits. It advised that the 2016 "due from affiliate" balances had to be treated as "contra-equity" because it was atypical to have such a significant balance due, and there was nothing in writing documenting the advances the general partners made to their affiliates, the terms for repayment, or anything showing that at least some repayment was made. The contra-equity designation would reduce the general partners' account balance and was a red flag to the limited partners. Therefore, the general partners insisted that the loaned amounts be reflected as "due from affiliate," which would instead suggest the amounts due involved a non-suspect transaction and were still expected to be paid back. Baker Tilly declined to do so.

As a solution, the general partners produced written notes with defined repayment terms payable to the partnership from Naimisha, which Barot co-owned. In August 2018, the general partners forwarded Baker Tilly two promissory notes from Naimisha to the respective general partners, agreeing to pay

$100,000 to the general partners to "develop a detailed scope and repair cost plan" for both properties.

Baker Tilly accepted the promissory notes as satisfactory and completed its 2017 audits in September 2018. The 2017 audits for both partnerships indicated that Naimisha pledged the general partners $100,000. Of that amount, Naimisha still owed $87,883 to the Fountainview partnership and all $100,000 to the Park Terrace partnership. Even though Naimisha had not completed its payments, Baker Tilly listed the 2016 amounts due as "due from affiliate" balances, and did not reduce the partnerships' equity based on their unpaid status. Park Terrace's 2017 audited financial statement also disclosed that the partnership made new advances during the year in the amount of $3,261 to undisclosed affiliates of Creative Choice XXXI, and that amount was due as of December 31, 2017.

In January 2019, the limited partners hired Hunt Capital Partners ("Hunt") to represent their interests in the limited partnerships, namely to protect their assets. On March 25, Hunt wrote to the respective general partners regarding improper advances and unauthorized use of partnership funds, but the general partners did not respond. On April 9, Hunt emailed the general partners again and requested an immediate response and repayment. Again, the general partners did not respond. Six days later, the limited partners' legal representative contacted the general partners regarding the general partners' failure to address the concerns outlined in the March 25 letter. The limited partners gave the general

partners until April 26, 2019, to reimburse the partnerships for the unauthorized financial distributions, including those that Baker Tilly identified, and to provide accurate records regarding the partnerships' financial status. Failure to do so, the limited partners stated, would result in the general partners being removed from their positions.

The general partners did not respond to the March letter. So, on May 3, 2019, the limited partners notified the general partners that they would have until June 3, 2019, to address all of the violations, particularly in misappropriation of funds and prohibited advances, outlined in the letter. The general partners responded by the June 3 deadline, asking for more time to repay the amounts owed. However, even with the additional time, the general partners never satisfied those payments. By this point, more than thirty days had passed since the limited partners first notified the general partners of their need to either resolve the breaches or leave office.

On June 18, 2019, the limited partners informed the general partners that they were being removed from their positions. The next day, the general partners offered to send a wire transfer to cure all their defaults in exchange for the limited partners rescinding their notices of removal. On June 21, the general partners issued a check to Park Terrace in the amount of $141,235, and a check to Fountainview Apartments in the amount of $105,994.

The limited partners confirmed receipt of the checks on June 28, but they did not consider the payments as remedying the violations. In particular, the checks arrived without any explanation as

to what specific debts were being repaid and, moreover, did not fully satisfy the total amounts owed.  Additionally, the limited partners maintained that payments should have included penalties for failing to timely report the financial irregularities as required under the partnership agreements.  The general partners, in response, sent a letter on July 5, arguing the payments were sufficient to return the parties to the status quo.

## II.    PROCEDURAL BACKGROUND

The general partners sued the limited partners in state court for breaching the partnership agreements, and for a declaratory judgment that their removal was unauthorized.[4]  The limited partners removed the case to federal court[5] and counterclaimed against the general partners and Impro,[6] asserting breach of contract and seeking a declaratory judgment affirming their authority to remove the general partners.

At trial, the general partners maintained that they did not materially breach the partnership agreements because the limited

---

[4] The general partners sued the Fountainview and Park Terrace limited partners separately in state court.  The limited partners removed the actions to federal court, and the cases were tried together.

[5] The limited partners removed based on diversity jurisdiction.  The general partners moved to remand because they alleged that the limited partners failed to establish complete diversity of citizenship.  The district court held that the limited partners established complete diversity of citizenship and denied the motion to remand.

[6] Impro was not originally a party to the case but was joined as a counter-defendant in the limited partners' counterclaim.

partners still received the substantial benefit of their bargain, namely tax credits in exchange for their initial capital contributions. They further argued that the limited partners had been fully aware of their actions for a significant period of time and yet had done nothing. It was only now, they contended, that the limited partners were trying to exercise a right that would actually result in them gaining a "windfall" of economic benefits from their removal.

The limited partners responded that, while for years the general partners had been improperly taking money from the partnerships, the amounts had become exorbitant which is why they decided to remove the general partners. They maintained that the misappropriation of funds constituted a material breach that significantly reduced the expected returns on their investments. The limited partners further claimed that, instead of curing the breaches, the general partners tried to conceal their actions by creating fraudulent financial notes and submitting late, improperly funded checks. Finally, they argued that removing the general partners was a remedy outlined in the partnership agreements, so it did not result in improper forfeiture.

On the stand, Barot admitted that the payments to the general partners' affiliates were improper because the payments included money that should have been paid to the limited partners and did not comply with the Agreements' waterfall provisions. Barot also admitted that he and his wife owned Naimisha Construction, Inc. Yet, he maintained that the limited partners did not object to the payments until Hunt gained control. He also alleged

that the limited partners suggested creating the Naimisha note because they wanted to formalize the amounts due as a partnership asset, as opposed to a "due from affiliate" balance.

The district court ruled in favor of the limited partners. The court concluded that the general partners materially breached the agreements and failed to timely remedy those violations. It specifically found that, while the amounts of improper withdrawals were a small fraction of the limited partners' overall expectations regarding tax credits and savings, the general partners withdrew a substantial portion of the partnerships' available cash for some years, meaning that they reduced the cash flow otherwise due to the limited partners and reduced the financial security of the partnership. The court determined that both Baker Tilly and Barot considered the amounts to be significant, and that the funds were important to the limited partners in case of emergencies and other unexpected events. Furthermore, the court found that the diversion of funds materially affected the relationship between the partners, rupturing any mutual trust and their ability to work together. The breach, thus, deprived the limited partners of substantial, bargained-for benefits.

As to Park Terrace, the court found that the general partners continued to make improper advances even after receiving the notice of the default, that they did not resolve the unauthorized withdrawals until months after they received their removal letter, and that they directed that those deposits be recorded as being made months earlier. Additionally, the district court determined that the

funds the general partners deposited in the partnership accounts were insufficient to remedy the violations because the money was comprised in part from loans to the partnerships, which the partnership agreement also prohibited. Therefore, the general partners' payments still failed to cure the breaches.

The court also found that the limited partners did not waive their right to remove the general partners, and were not otherwise estopped from doing so, because the limited partners complained on multiple occasions that the general partners' conduct violated the partnership agreements and properly requested that the general partners return improperly distributed funds. Therefore, the court ordered that the general partners be removed in accordance with the partnership agreements.

## III.    STANDARDS OF REVIEW

On appeal following a bench trial, we review a district court's conclusions of law *de novo* and its findings of fact for clear error. *A.I.G. Uru. Compania de Seguros, S.A. v. AAA Cooper Transp.*, 334 F.3d 997, 1003 (11th Cir. 2003). A finding of fact is clearly erroneous "when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *OHI Asset (VA) Martinsville SNF, LLC, et al. v. Wagner* (*In re Wagner*), 115 F.4th 1296, 1303 (11th Cir. 2024) (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985)). When "there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Id.* (quoting *Anderson*, 470 U.S. at 574). We

review a district court's decision to grant or deny equitable relief for abuse of discretion, and any factual findings supporting its decision for clear error. *Preferred Sites, LLC v. Troup County*, 296 F.3d 1210, 1220 (11th Cir. 2002).

## IV.    DISCUSSION

On appeal, the general partners raise four arguments: (1) that the district court clearly erred in determining that the breaches caused material damage, (2) that the district court clearly erred in finding that their breaches were not fully cured, (3) that their removal constituted an impermissible forfeiture and windfall for the limited partners, and (4) that the district court should have applied waiver or estoppel to prevent their removal. We find that the district court's findings of fact were not clearly erroneous and that its conclusions of law were correct.

### A. Materiality

The general partners argue that the district court erred in concluding that their actions were material and detrimental. Specifically, they assert that, regardless of their own actions, the limited partners received their essential, bargained-for tax and other benefits. If anything, they maintain, the advances constituted a small amount of the partnerships' overall monetary value and had no negative impact on the partnerships' financial stability.

Some of the provisions in the partnership agreements required that the prohibited conduct materially harm the limited partners in order to justify a general partner's removal. Specifically, the Fountainview partnership agreement allowed for the

23-10197                 Opinion of the Court                 17

removal of a general partner "for any intentional misconduct, malfeasance, fraud, act outside the scope of its authority, breach of its fiduciary duty, or any failure to exercise reasonable care with respect to any material matter in the discharge of its duties" and when the general partner "violated any material provision of applicable law (provided that such violation results in, or is likely to result in, a material detriment to or an impairment of the Partnership, the Limited Partners, the Project, or the assets of the Partnership)." The Park Terrace partnership agreement allowed for the removal of a general partner for a "material default," which included a breach by the general partner of any obligation "which has, or may reasonably be expected to have, a material adverse effect on the Partnership, the Apartment Complex, or the Investor Limited Partner," and included "gross negligence, fraud, willful misconduct, misappropriation of Partnership funds, or a breach of fiduciary duty" by the general partner.

The partnership agreements do not define what constitutes a "material" breach. Therefore, we turn to Florida law for guidance as to the best way to interpret the contractual requirement of materiality.[7] *See Liberty Surplus Ins. Corp. v. Kaufman Lynn Constr., Inc.*, 130 F.4th 903, 911 (11th Cir. 2025). The parties' intent when entering the contract serves as an important starting point. *Massey*

_____

[7] Both agreements contained a choice of law provision providing that Florida law governs, and the parties agree that Florida law applies. *See Walls v. Quick & Reilly*, 824 So. 2d 1016, 1018–19 (Fla. 5th DCA 2002); *Default Proof Credit Card Sys. v. Friedland*, 992 So. 2d 442, 444 (Fla. 3d DCA 2008).

*Servs., Inc. v. Sanders*, 312 So. 3d 209, 214 (Fla. 5th DCA 2021).  We can determine a party's intent by looking at the use of terms within the four corners of the contract, taking into consideration the debated provision within the context of the entire agreement.  *Id.*; *Hand v. Grow Const., Inc.*, 983 So. 2d 684, 687 (Fla. 1st DCA 2008); *16205 Captiva Drive, LLC v. Levinson*, 418 So. 3d 751, 755 (Fla. 6th DCA 2025).  A word is presumed to have the same meaning throughout the contract.  *R.J. Reynolds Tobacco Co. v. State*, 301 So. 3d 269, 275 (Fla. 4th DCA 2020) (applying the presumption of consistent usage to contract); ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 170 (2012) (presumption of consistent usage).  Further, every word in a contract should be given effect and treated consistently, such that it is not redundant.  *Royal Am. Realty, Inc. v. Bank of Palm Beach & Tr. Co.*, 215 So. 2d 336, 338 (Fla. 4th DCA 1968) (citing *Fla. E. Coast Ry. Co. v. City of Miami*, 79 So. 682, 683 (Fla. 1918)) (applying the surplusage canon to a contract); SCALIA & GARNER, READING LAW 174 (surplusage canon).

When the meaning of a term is unambiguous, we apply the term's plain meaning.  *Massey Servs., Inc.*, 312 So. 3d at 214 (quoting *Waverly 1 & 2, LLC v. Waverly at Las Olas Condo. Ass'n*, 242 So. 3d 425, 428 (Fla. 4th DCA 2018)).  There are multiple sources for interpreting otherwise undefined terms, and dictionaries are just one source.  *See Parrish v. State Farm Fla. Ins. Co.*, 356 So. 3d 771, 776 (Fla. 2023).  Importantly, a term's context in the contract may indicate that the parties intended to give it a meaning other than the one ascribed in general usage.  *See id.* at 774.

Here, to remove a general partner, the agreements required that the violation at issue result in a "material detriment" or have a "material adverse effect." The Fountainview agreements described only two instances in which a "material detriment" could trigger the limited partners' right to remove the general partner. The first reference allowed the limited partners to remove the general partner for intentional misconduct or malfeasance in the discharge of the general partner's duty when such violation results in a material detriment to the partnership. The second relevant provision allowed for removal when the general partner violated a material provision of the agreement, provided that such a violation resulted in a material detriment to the partnership. The Fountainview agreement also used "material" to describe other circumstances. As stated, it referred to "material provisions" in the context of removing a general partner, but elsewhere it simply referred to "provisions." For instance, in describing the duties of the limited partners, the contract required them to "comply with the provisions of this Agreement expressly applicable." The agreement also used "material adverse effect" and "adverse effect" on different occasions. In one spot, the agreement confirmed that general partners would not apply for grant funding unless the grant would not "materially adversely affect the tax benefits" of the limited partners. In another, however, the contract described that the limited partners had no obligation to consent to an amendment that could "adversely affect the timing or amount of the allocation of [their] tax credits" or income.

The contexts in which the Fountainview agreement used "material" indicate that it was intended to heighten the level of significance or seriousness of the detriment, provision, or effect being described. The agreement connected "material provisions" to the serious consequence of removal from the partnership. By contrast, the contract merely required compliance with "provisions" when describing the limited partners' duties to perform under the agreement, which is subject to less severe penalties than removal. Similarly, the general partner was prohibited from materially affecting the tax benefits of the limited partners through grant funding, the phrasing of which tolerated minor negative effects, while the limited partners were free to decline any change that would adversely affect their credits or income, granting them authority to refuse any alteration that would marginally impact their benefits. This wording was intentional, as both increased the latitude given to the parties—allowing general partners to apply for grants that might have a marginal impact on the limited partners' benefits and permitting the limited partners to reject any alteration that would even minimally impact them—while still largely protecting the tax credit benefit.

The Park Terrace agreement contained a similar distinction between phrases that used "material." The section on removal contemplated the removal of a general partner when the breach had a "material adverse effect." There is only one place in the contract in which "adverse effect" is used without "material," and there it states that the general partner will take all actions necessary to classify the partnership as a partnership for federal income tax

purposes and will refrain from taking any action "which would adversely affect such treatment." The agreement used "material" in other circumstances. In one provision, the contract stated that the general partner had no authority to "materially" amend or modify any mortgage loan or project documents without the consent of the limited partners. In another, the agreement stated that it did not "permit any party . . . to alter, modify or amend any term" in the agreement. These comparisons demonstrate a similar understanding of "material" as in the Fountainview contract. While the general partner could not substantially amend mortgage loans or project documents, some minor alterations were apparently allowed; however, no party was allowed to modify any term of the partnership agreement, regardless of the alteration's materiality. Similarly, while the general partner must have engaged in conduct that had a material adverse effect to enact removal, it was required to undergo all actions necessary to maintain its federal tax status, because even a minor change there could be detrimental.

This internally consistent understanding of "material" gleaned from the four corners of each of the contracts aligns with the plain and ordinary meaning of the word "material." Looking at dictionary definitions, Merriam-Webster defines "material" as "having real importance or great consequences." *Material,* MERRIAM-WEBSTER.COM, https://www.merriam-webster.com/dictionary/material. Similarly, Black's Law Dictionary defines "material" as "[o]f such a nature that knowledge of the item would affect a person's decision-making; significant; essential." *Material*, BLACK'S LAW DICTIONARY (9th ed. 2009). Taken together,

"material" means having real importance or being significant. This fits with the discussed context of "material" in the contracts, which permitted removal of general partners for more significant breaches in circumstances that held greater consequence and could result in meaningful harm to the partnership. Therefore, to effectuate the general partners' removal under the agreements, the harm faced by the limited partners must have been real and significant.

The district court found the detriment to the limited partners to be significant. It found that the general partners "repeatedly, intentionally, and willfully diverted thousands of dollars to non-partnership uses, over the objection of the [l]imited [p]artners, in violation of their duties as [g]eneral [p]artners." Order at 27, Dkt. 173. It determined that this "conduct by its nature is likely to have or could reasonably be expected to have a materially adverse or detrimental effect on the partnerships because it affects the relationship of the partners." *Id.* The court found that the general partners conduct had deprived the limited partners of their owed distributions. It found unconvincing the general partners' arguments that the breaches were not material because the overall value of the misappropriated amounts was small in comparison with the value of the project and the limited partners still received the bargained-for tax benefit.

Creative Choice XXX and Creative Choice XXXI raise similar arguments on appeal. However, we agree with the district court that the harm faced by the limited partners was material. The

23-10197                Opinion of the Court                23

owner of the general partners, the chief financial officer of Hunt, and the general partners' auditing firm all stated that the amounts misappropriated were material. The misappropriated cash comprised a significant portion of the partnerships' cash on hand, and in some cases, it was as much as a month's worth of operating expenses. This was a significant issue for the limited partners, who sought to ensure that there was adequate funding in the partnership should needs arise, such as property improvements, maintenance, or upkeep. The general partners' conduct also made it so that the limited partners were unable to trust and do business with them. Further, the limited partners ultimately received less money because there was less money in the partnership for the year-end waterfall distribution.

In their brief, Creative Choice XXX and Creative Choice XXXI argue that the standard for materiality is whether the injured party received substantially what it bargained for, which is the standard used in breach of contract cases. They cite cases that discuss materiality as used to measure breach of contract. *See, e.g.*, *Ron Matusalem & Matusa of Fla., Inc. v. Ron Matusalem, Inc.*, 872 F.2d 1547, 1551 (11th Cir. 1989). In Florida, a material breach is when non-compliance with the contract goes "to the essence of the contract," *JF & LN, LLC v. Royal Oldsmobile-GMC Trucks Co.*, 292 So. 3d 500, 509 (Fla. 2d DCA 2020), such as when the contract would not have been made without the covenant not performed, *Seawatch at Marathon Condo. Ass'n, Inc. v. Guarantee Co. of N. Am.*, 286 So. 3d 823, 829 (Fla. 3d DCA 2019). The general partners state that relevant considerations include the extent to which the injured party can be

compensated for its injury, to what degree the breaching party will suffer a forfeiture, and whether the breaching party performed with good faith and fair dealing.

Considering this "contract law" definition of materiality, the district court still found that the breach was material. It found that the general partners deprived the limited partners of substantial, bargained-for benefits, such as a working relationship between the parties, their core fiduciary duties, and the diverted cash flow.

Applying the general partners' breach of contract standard, we agree with the district court. The general partners acted in clear disregard of vital terms of the contract, including the cash distribution order, and continually violated their fiduciary duties and did not act in good faith. The general partners refused to cease violating the partnership agreements despite repeated warnings, continued to do so after the notice of removal, failed to timely cure, and then attempted to fraudulently cover up that failure. While the general partners argue that the essential benefits were the tax credits, those credits are not the only important bargained-for benefit in the contract, and in fact, the limited partners received less overall money because of Creative Choice XXX's and Creative Choice XXXI's actions. Additionally, as discussed above, the limited partners were validly concerned about the financial health and stability of the partnership, and that was put in jeopardy by the general partners' malfeasance. Though we discuss forfeiture later, the general partners' removal is not an impermissible forfeiture, and here, it is not outweighed by the other factors, given their blatant and

continuous disregard for the partnership agreements and breaches of their fiduciary duties.

In summary, the general partners' improper withdrawal of thousands of dollars from the partnership to use on non-partnership purposes caused material harm.  It violated the terms of the agreement, reduced the financial security of the partnership, deteriorated trust, and resulted in less funds available to be distributed to the limited partners.

### B.  Cure

Creative Choice XXX and Creative Choice XXXI argue that the district court clearly erred in finding that the checks the general partners sent in June 2019—made out for $141,235 to the Park Terrace partnership and for $105,994 to the Fountainview partnership—were insufficient to satisfy the outstanding balances.

The dispute over whether the general partners adequately cured is contractual, and Florida law applies because this case proceeded under diversity jurisdiction.  *See Endurance Am. Specialty Ins. Co. v. Liberty Mut. Ins. Co.*, 34 F.4th 978, 983 (11th Cir. 2022).  When determining whether a party has cured a contractual breach, Florida courts look to the language of the contract as a whole, including the contractual cure requirements, and the facts surrounding the breach.  *See Jones v. Warmack*, 967 So. 2d 400, 402 (Fla. 1st DCA 2007) (interpreting the cure obligation through the language of the whole contract); *cf. Sun Bank of Miami v. Lester*, 404 So. 2d 141, 143 (Fla. 3d DCA 1981) (attempt to cure insufficient when the cure was inadequate to fully address other contract terms).

Under the Fountainview partnership agreement, Creative Choice XXX was required to cure any defect within thirty days after the limited partners gave notice. However, if Creative Choice XXX began diligently and consistently repaying the debt within the thirty-day period, it would have sixty days to fully cure the breaches. Under the Park Terrace partnership agreement, Creative Choice XXXI had thirty days to remedy its violations upon receiving notice.

The general partners received said notice that their affiliate transactions were improper. The limited partners sent multiple communications notifying the general partners of their objection to the unauthorized use of partnership funds. On May 3, 2019, the limited partners wrote letters to each of the general partners providing "formal notice" of defaults and warning the general partners that they had thirty days to remedy the misappropriation of partnership funds and prohibited advances to their affiliates.

The district court found that the May 3 letter formally notified the general partners that they were in default for any improper cash advances that took place until May 3, 2019. Creative Choice XXXI contends that it was only on notice for amounts owed to the Park Terrace partnership for the 2017 and 2018 improper transactions, not for improper transactions that occurred in 2019. This is incorrect. The May 3 letter stated that the limited partners had not completed their investigation of the partnership's records because the general partner had not provided them with the most up-to-date financial statements. However, it clarified that additional

23-10197                Opinion of the Court                27

violations may surface as the limited partners receive and review the complete records, and that the limited partners reserved their right to challenge any such additional violations. While the letter specifically denoted the advances from 2017 and 2018, it highlighted that the ultimate concern was that Creative Choice XXXI was making unauthorized payments to its affiliates. Based on the letter's language, the district court's finding that Creative Choice XXXI was formally notified of its default involving the affiliate advances before May 3, 2019, is not clearly erroneous.[8] *See generally Hous. Inv. Corp. v. Am. Bancshares Mortg. Co.*, 367 So. 2d 645, 646 (Fla. 3d DCA 1979) (a default letter may explain default in general terms and is not required to particularize all defaults).

Additionally, the district court's factual findings regarding the nature and impact of the general partners' breaches were not clearly erroneous. The record supports that Creative Choice XXX used an improper loan to the Fountainview partnership to fund its June 21 remedial check, as the district court found. The evidence showed Impro loaned money to the partnership to cover the

---

[8] To the extent that the district court found that Creative Choice XXXI was on notice for the events that occurred after the limited partners sent the default letters, that would be clearly erroneous. Creative Choice XXXI could not have cured its transactions that occurred two months after May 3, 2019, within 30 days of the letter. However, that does not alter the conclusion that Creative Choice XXXI failed to timely cure as discussed in this Section. By Creative Choice XXXI's own admission, it did not cure the early 2019 transactions until November 2019. November 2019 was well beyond the contractual cure period for the impermissible 2019 transactions that took place from January 2019 to May 3, 2019.

breaches which, in and of itself, violated the partnership agreements. The agreements expressly prohibited unauthorized loans. Additionally, a loan to the partnership would not satisfy the cure provision because, instead of being made whole, the partnership would still be indebted to a lender.

The general partners' June 3 email, explaining how they planned to remedy the default, stated that they "intend[ed] to make the necessary **loan(s)** to the respective partnership to correct any underpayments." Indeed, the checks' funds appeared to be sourced from loans. Barot testified about the funds for the checks. The funds came from Creative Choice, which transferred the necessary money to the partnership accounts before the checks were written. Part of that transferred funding included a $77,000 deposit, a manager of the general partners described as a loan, and which a July 3, 2019, communication between two general partners' representatives referred to as a loan to cover the Fountainview check balance. Furthermore, Creative Choice XXX's sworn interrogatory indicated that funds used to issue the check to Fountainview came from the management company Impro. In auditing the Fountainview partnership, Baker Tilly's ledger listed a $54,500 "short term loan" from Impro "to cover outstanding distributions made to [limited partners]." This language was provided to Baker Tilly by a representative of the general partnerships.[9]

---

[9] The general partners argue that Baker Tilly's ledger contained improper hearsay evidence. However, the general partners did not object to this evidence's admission at trial, and it was offered as part of the parties' joint

23-10197                Opinion of the Court                29

Regarding Creative Choice XXXI, the district court deter-mined that its June 21 check to the Park Terrace partnership did not resolve the default because the general partners continued to make improper cash advances after receiving notice and did not pay back the necessary funds until after the deadline to cure. The evidence shows that there were improper payments to Creative Choice XXXI's affiliates as late as July 2019, two months after the limited partners notified it of its default, and Creative Choice XXXI does not dispute this. Creative Choice XXXI also admits that it at-tempted to cure all the improper 2019 Park Terrace payments in November 2019, but it sought to backdate the payment to Septem-ber 2019 to disguise the otherwise late reimbursement, even though September was well beyond the appropriate deadline. Therefore, by its own admission, it failed to timely cure the imper-missible 2019 transactions that took place from January 2019 to May 3, 2019.[10] *See Tim Hortons USA, Inc. v. Singh*, No. 16-23041-CIV,

---

exhibits. Absent plain error, an alleged hearsay statement that is not objected to at trial is generally admissible for any relevant purpose. *United States v. Walker*, 720 F.2d 1527, 1536 (11th Cir. 1983). The writing on the ledger did not lead to plain error even if it constituted impermissible hearsay. The dis-trict court could have reached the same ultimate conclusion, i.e., that the check to Fountainview included funds that the general partners borrowed from the partnership, based on the Creative Choice XXX's representative's email stating that a loan was necessary to cure, the internal email between two of Creative Choice XXX's representatives referring to $77,000 as a loan, and a Creative Choice XXX manager's testimony confirming that there was a loan to the partnership of $77,000.

[10] Creative Choice XXXI does not dispute that it attempted to backdate the repayment or that it continued advancing funds to its affiliates well into 2019.

2017 WL 4837552, at *10 (S.D. Fla. Oct. 25, 2017) (applying Florida law, holding that a belated offer to cure is insufficient); *Hufcor/Gulf-stream, Inc. v. Homestead Concrete & Drainage, Inc.*, 831 So. 2d 767, 769 (Fla. 4th DCA 2002) (holding that a late payment does not cure a default when there was an agreement for payment on or before a specified date); *see generally KRG Oldsmar Project Co., LLC v. CWI, Inc.*, 358 So. 3d 464, 468 (Fla. 2d DCA 2023) ("When a contract is clear and unambiguous, the court's role is to enforce the contract as written, not to rewrite the contract to make it more reasonable for one of the parties.").

Finally, the general partners argue the limited partners impeded their efforts to cure the breach by not accepting the checks as full payment and by not identifying what other steps had to be taken in order to satisfy the debts. Putting aside the general partners' efforts to hold the limited partners responsible for the unpaid debts the general partners themselves created and owed, their attempts to repay a loan by taking out another loan were ineffective for the reasons already stated.

Additionally, the general partners' legal arguments do not match the facts of this case. They quote *Blackhawk Heating & Plumbing Co. v. Data Lease Financial Corp.*, for the proposition that,

Instead, it argues that it took time for its external accounting firm to cease the practice of improper advances. That does not undermine the district court's core findings that it continued to make improper cash advances at least seven months into 2019 and sent the check after the due date, failing to timely cure the impermissible transactions for which it was on notice.

23-10197                Opinion of the Court                31

"[w]hen a party stipulates that another shall do a certain thing, he thereby impliedly promises that he will himself do nothing which will hinder or obstruct that other in doing that thing." 302 So. 2d 404, 410 (Fla. 1974). In *Blackhawk*, a plaintiff had an option contract to acquire a portion of bank stock at an amount computed by a complex mathematical formula set by the contract. *Id.* at 406. The Supreme Court of Florida found that the defendant made it impossible for the plaintiff to exercise the option because the defendant refused to allow the plaintiff to access its books and records, so there was no way for the plaintiff to compute the purchase price. *Id.* The general partners also cite a similar case, *PL Lake Worth Corp. v. 99Cent Stuff-Palm Springs, LLC*, in which a party was unable to exercise a purchase option because the other party did not provide the amount due.[11]   949 So. 2d 1199, 1200 (Fla. 4th DCA 2007).

---

[11] The general partners also rely upon two other cases which, likewise, are inapplicable. In *Paul v. Hurley*, 315 So. 2d 536 (Fla. 4th DCA 1975), the court found that the plaintiff's repayment of her loan was frustrated by the defendants, who diverted her loan payments for their own interest, and reversed a judgment in the defendants' favor. That is not the case here because the limited partners did not divert the general partners' payments for inappropriate personal purposes; the general partners tried to reimburse the partnerships with funds from an improper source. The general partners also quote *Cox v. CSX Intermodal, Inc.*, 732 So. 2d 1092 (Fla. 1st DCA 1999) for the proposition that a party has a duty to act in good faith even when the contractual terms afford them discretion to promote their self-interest. This case is unrelated, too. The contracts here did not provide the limited partners discretion to promote their self-interest in the cure process—in fact, the limited partners had no contractual responsibilities after they provided notice. The contracts stated that the *general partners* shall have thirty days after receiving notice to cure any defaults. We address the appellants' arguments that the limited partners acted

There, a retailer had the option to renew their leased space, which it could exercise if it paid an unspecified amount based on maintenance fees and taxes, but the owner of the shopping center refused to provide the amount owed. *Id.* The court held that the owner had an implied duty to provide the amount due. *Id.* at 1202. The owner's good-faith cooperation was necessary for the optionee to exercise his option. *Id.*

A few things differentiate those cases from the matter at hand. First, here, the general partners had a contractual duty to cure, and the contracts at issue in *Blackhawk* and *PL Lake Worth* dealt with purchase options, a separate matter entirely. While both involve the transfer of money, cure under the contracts is the general partners' duty to remedy any default that *they caused*. An option contract, on the other hand, involves an agreement to keep a contract open so the optionee may accept later, should they desire. *See, e.g.*, *Polk v. BHRGU Avon Props., LLC*, 946 So. 2d 1120, 1122 (Fla. 2d DCA 2006). The issue in *Blackhawk* and *PL Lake Worth* was that when the optionee attempted to exercise their option, the optionor refused to tender the information necessary to do so. In those cases, the optionor was the only entity that knew the amounts to be paid to exercise the options. *Blackhawk*, 302 So. 2d at 410; *PL Lake Worth*, 949 So. 2d at 1200–01. Here, however, the general partners were aware of the amounts borrowed, the amounts still owed, and to whom the payments were due. Once the limited

in their own self-interest in removing them as general partners, resulting in a "windfall," in the forfeiture and waiver section of this Opinion.

partners notified the general partners of the cause for removal, the general partners should have acted within the allotted time frame to cure the breaches.  They did not.

Given the district court's factual findings, we agree that the general partners failed to remedy, or otherwise cure, the violations for which they were responsible.

### C.  Forfeiture and Waiver

Creative Choice XXX and Creative Choice XXXI argue that their removal resulted in an "extreme forfeiture" that is prohibited under Florida law, and that, as a result of their removal, the limited partners will gain a large windfall.  We agree with the district court that their removal was permissible.

Florida courts have recognized an impermissible forfeiture when a party loses a vested property interest or right as a penalty for breaching a contract or violating a law.  *Howard Cole & Co. v. Williams*, 27 So. 2d 352, 356 (Fla. 1946).  Pertinent here, "[w]hile forfeitures are not favored, a forfeiture will be enforced where it is clear that the parties intended such a result."  *Stoltz v. Truitt*, 940 So. 2d 521, 523 (Fla. 1st DCA 2006) (citing *Nelson v. Hansard*, 197 So. 513, 513–514 (Fla. 1940)).  A court should not relieve a party when the forfeiture is due to its own negligence or willful and persistent violations of the contract.  *Id.*

"Under Florida law, every contract provision should be given meaning and effect."  *Stinson, Lyons, Gerlin & Bustamante, P.A. v. Brickell Bldg. 1 Holding Co.*, 923 F.2d 810, 813 (11th Cir. 1991).  The partnership agreements expressly allowed for the limited partners

to remove the general partners under certain circumstances, including the circumstances that the district court found to have occurred and that we affirmed. Under long-established Florida law, while forfeitures may not be favored, a party can legally make a contract that includes a forfeiture provision, and a court should enforce that provision when it is clear that the parties so agreed. *Nelson*, 197 So. at 513–514.

Forfeiture is inequitable when the breaching party substantially complied with the contract's terms. *Stoltz*, 940 So. 2d at 523. However, when the terms are clear and certain actions are proscribed, the court will enforce the contract as written, even if it results in a forfeiture. *Jenkins v. Eckerd Corp.*, 913 So. 2d 43, 54 (Fla. 1st DCA 2005).

As the district court found, the general partners did not exercise good faith in managing their partnerships, and they willfully and persistently breached their fiduciary and contractual duties. Therefore, the general partners did not substantially comply with the terms of the agreement by breaching pertinent contractual conditions that were clearly expressed. Forfeiture is not improper here.

Creative Choice XXX and Creative Choice XXXI's arguments to the contrary are unavailing. First, they argue that the limited partners delayed bringing their claim, and thus waived their ability to enforce the removal provision. They assert that the limited partners waived this right because of their established course of conduct breaching the partnership agreements in this way.

A party may waive a right that they are legally entitled to, including forfeiture, either expressly or by their actions. *See Palacios v. Lawson*, 381 So. 3d 623, 627 (Fla. 4th DCA 2024); *Rader v. Prather*, 130 So. 15, 17 (Fla. 1930). Florida courts define waiver as "the voluntary and intentional relinquishment of a known right or conduct which implies the voluntary and intentional relinquishment of a known right." *Raymond James Fin. Servs. v. Saldukas*, 896 So. 2d 707, 711 (Fla. 2005). The district court found that the limited partners did not waive their rights here, which is generally a question of fact. *Echo v. MGA Ins. Co.*, 157 So. 3d 507, 512 (Fla. 1st DCA 2015) (collecting cases to demonstrate that the existence or absence of waiver is a question of fact).

We agree that the limited partners did not waive their contractual rights. The general partners' conduct did not consist of a one-time breach that occurred years before the suit was brought. The general partners were continually breaching the agreement, including after they received notice of the default. The limited partners' representative testified that he objected to improper partnership fund withdrawals every year dating back to 2011. Further, the transactions that this suit stemmed from came to light in the 2017 audited financial statements, issued in September 2018. Hunt assumed control of the limited partners' interests in January 2019, and Hunt first corresponded regarding the improper advances in March 2019. Therefore, Hunt raised this issue within a couple of months of beginning to manage the limited partners and a handful of months after the audit was finalized. *Fla. State Dep't of Env'tl. Regul. v. Puckett Oil Co.*, 577 So. 2d 988, 993 (Fla. 1st DCA 1991)

("[I]n order for waiver to be applied based on the passage of time, we consider it essential for a showing to be made that the party against whom waiver is asserted has received notice sufficient to commence the running of the time period within which the response is required."); *MDS (Canada) Inc. v. Rad Source Techs., Inc.*, 720 F.3d 833, 852 (11th Cir. 2013) ("[W]aiver does not arise merely from forbearance for a reasonable time." (quoting *Am. Somax Ventures v. Touma*, 547 So. 2d 1266, 1268 (Fla. 4th DCA 1989))), *certified question answered,* 143 So. 3d 881 (Fla. 2014). Taken together, the limited partners continually objected to this practice and timely raised the issue once they discovered the most recent violations. There is no evidence of unreasonable delay, and the general partners fail to establish that the limited partners intended to relinquish their rights. Waiver does not apply in this case.

Creative Choice XXX's and Creative Choice XXXI's second and third arguments are related. They argue that the limited partners were not substantially prejudiced because the general partners' breach did not cause any harm. Additionally, they argue that the limited partners will receive a windfall by the general partners' removal. We have already stated the substantial harm that the general partners caused. Here, because the general partners caused harm and failed to cure, there would not be a windfall in enforcing the negotiated terms of the partnership agreements. *Contra Fowler v. Resash Corp.*, 469 So. 2d 153, 154 (Fla. 3d DCA 1985) (affirming a denial of forfeiture because it would be a windfall when the plaintiffs suffered no actual damages and admitted that defendants cured any and all violations). Additionally, as stated, a forfeiture is

allowed when the cause is due to a party's own willful and persistent violations of the contract, as is present here. The general partners admit they have a long history of violating the agreements, and those actions were in willful and blatant disregard of the agreements' terms and to the limited partners' objections. The general partners willingly entered into these agreements, then decided to breach the terms of their contracts, resulting in their removal.

We affirm the district court and find that the enforcement of the contractual provisions removing the general partners does not result in an impermissible forfeiture.

### D. Estoppel

Finally, Creative Choice XXX and Creative Choice XXXI argue that the district court should have estopped the limited partners from removing them. They contend that the limited partners continually chose not to exercise their contractual rights of removal, and never treated the breaches as material, leading them to reasonably believe removal would never occur. The district court found that no such estoppel applied. We agree with the district court.

A court applies equitable estoppel when one party's deceptive conduct leads another party to taking an unfavorable legal position. *Major League Baseball v. Morsani*, 790 So. 2d 1071, 1076 (Fla. 2001). This occurs when (1) the instigating party makes "a representation as to a material fact that is contrary to a later-asserted position;" (2) the party claiming estoppel reasonably relied on that representation; and (3) that party detrimentally changed its

position because of the representation and its reliance. *Progressive Exp. Ins. Co. v. Camillo*, 80 So. 3d 394, 401–02 (Fla. 4th DCA 2012).

Creative Choice XXX and Creative Choice XXXI establish none of those elements. First, they do not point to any representation by the limited partners that is contradictory to a later asserted position. In fact, the record demonstrates, and the district court found, that the limited partners did raise issues with the general partners' conduct prior to 2019. Second, the general partners provide no example of how they relied on the limited partners' alleged representation. Finally, the general partners do not argue that they changed their position in any way. Finding none of the elements of estoppel satisfied, we decline to apply it here and affirm the district court's decision.

## V.    CONCLUSION

For the reasons stated above, the district court's findings were not clearly erroneous, its conclusions of law were proper, and we affirm its decision.

**AFFIRMED.**

23-10197                Newsom, J., Concurring                1

NEWSOM, Circuit Judge, concurring:

I concur in the Court's decision and join its opinion. I write separately merely to express a different interpretation of the Fountainview Partnership Agreement from the one the Court adopts—albeit one that leads to the same result that the Court reaches. Warning: This may seem a little weedsy.

Section 8.15(a)(i) of the Fountainview agreement states that a Limited Partner can remove a General Partner:

> for any intentional misconduct, malfeasance, fraud, act outside the scope of its authority, breach of its fiduciary duty, or any failure to exercise reasonable care with respect to any material matter in the discharge of its duties and obligations as General Partner (provided that such violation results in, or is likely to result in, a material detriment to or an impairment of the Partnership, the Limited Partners, the Project, or the assets of the Partnership)[.]

On the Court's reading of that provision, in order "to remove the [G]eneral [P]artner for intentional misconduct or malfeasance," a Limited Partner must first prove that "such violation result[ed] in a material detriment to the partnership." Maj. Op. at 20. Because the Limited Partners here demonstrated the requisite "material detriment," the Court concludes, the Fountainview agreement empowered them to remove the General Partners. *See id.* at 23–26.

Although the question is close, I don't think the Fountainview agreement requires a Limited Partner to prove "material detriment" as a prerequisite to removal for the sort of intentional misconduct or malfeasance at issue here. As I read § 8.15(a)(i), the "material detriment" proviso applies only to the "failure to exercise reasonable care" ground for removal, not to the other specified grounds. Here's why.

I begin with the traditional "rule of the last antecedent," which specifies that "a limiting clause or phrase . . . should ordinarily be read as modifying only the noun or phrase that it immediately follows." *Lockhart v. United States*, 577 U.S. 347, 351 (2016) (quoting *Barnhart v. Thomas*, 540 U.S. 20, 26 (2003)). The rule embodies a "commonsense principle of grammar," Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 144 (2012), and "reflects the basic intuition that when a modifier appears at the end of a list, it is easier to apply that modifier only to the item directly before it," *Lockhart*, 577 U.S. at 351.

Now, to be sure, there is an oft-competing principle of interpretation, the "series-qualifier canon," which instructs that "'[w]hen there is a straightforward, parallel construction that involves all nouns or verbs in a series,' a modifier at the end of the list 'normally applies to the entire series.'" *Id.* at 364 (Kagan, J., dissenting) (quoting Scalia & Garner, *supra*, at 147). Here, though, I don't think there is a "straightforward, parallel construction that involves all nouns . . . in [the] series" that § 8.15(a)(i) lays out. I say so for two reasons.

23-10197                Newsom, J., Concurring                3

First, the provision comprises two distinct "any" clauses. The first authorizes a Limited Partner to remove a General Partner for "any" of several things: "intentional misconduct," "malfeasance," "fraud," "act outside the scope of its authority," or "breach of its fiduciary duty." The second authorizes removal for "any failure to exercise reasonable care with respect to any material matter in the discharge of its duties and obligations as General Partner." To my eye, that second "any" separates a General Partner's "failure to exercise reasonable care" from the types of wrongdoing enumerated in the first clause. If the second "any" didn't exist, I think it'd be relatively easy to treat all the forms of wrongdoing together—as an unbroken series, so to speak. But the second "any" does exist, and, on balance, I think it serves to bifurcate the provision into two separate categories. And the parenthetical "material detriment" proviso is attached to—and thus applies only to—the second of the two.

Second, and perhaps relatedly, there is a discernible difference, in terms of severity, between the acts enumerated in the first and second "any" clauses. The first clause catalogues various forms of purposeful wrongdoing—again, "intentional misconduct," "malfeasance," "fraud," an "act outside the scope of [the Limited Partner's] authority," and a "breach of its fiduciary duty." The second, by contrast, refers to simple negligence—the "failure to exercise reasonable care." By itself, the conduct targeted by the second clause just isn't as *bad* as that targeted by the first. And so, it makes sense that the agreement would require something "extra" before a second-category violation warrants a Limited Partner's

4                    Newsom, J., Concurring                    23-10197

removal—and that something, it seems to me, is a showing of "material detriment."

Anyway, none of this much matters here, because we all land in the same place: For one reason or another, the Limited Partners had ample authority under the Fountainview agreement to remove the General Partners in this case. The purist in me just needed to clarify what I take to be the better reading of § 8.15(a)(i).